Irving B. Kendall, J.
Sometime prior to July 15, 1971, the Mount Vernon Hospital, which is located on North 7th Avenue, Mount Vernon, N. Y., and which comprises a group of buildings housing various hospital facilities, opened a Methadone Maintenance Treatment Clinic for drug addicts, at 14 East Prospect Avenue, Mount Vernon, N. Y. Eligible for treatment at the clinic were persons over the age of 18 years and addicted to drugs for at least two years.
The building in which the clinic is housed is located in a retail store and office building complex block which is bounded on the west by Gramatan Avenue, on the north by East Prospect Avenue, on the east by North Third Avenue and the main station of the Penn Central Railroad (formerly the Mount Vernon station of the New York, New Haven & Hartford Railroad), and on the south by Fiske Place and the Penn Central right of way. Just around the corner from the subject premises, and on the east side of Gramatan Avenue, is the city’s major bus stop. Diagonally across the street from the subject premises and to the northeast thereof is the Midtown Urban Renewal area which is the site of the city’s first fully completed urban renewal project consisting of a brand-new high-rise residential development with neighborhood convenience stores, including a bank, a major supermarket, and a chain drug store.
The subject premises and other buildings in the same zoning district are located in the city’s downtown shopping area. The zoning district involved herein is the B-3 General Business District.
The city’s zoning ordinance does not permit either hospitals or clinics in such a zone.
On an agreed statement of facts, it is conceded that approximately 195 drug addicts are regularly treated at the subject premises.
Aside from leaving a urine specimen which is analyzed in an off-premises laboratory, each drug addict is examined and given a daily two-ounce dose of methadone mixed with “ Tang ”. According to Dr. David P. Ausubel, M. D., Ph.D., who is a consultant to the United States Federal Bureau of Narcotics, *477 methadone has all of the euphoric properties of morphine, except perhaps in lesser degree.[1]
On or before July 15, 1971, the City of Mount Vernon Commissioner of Buildings, who is responsible for the enforcement of the city’s zoning laws, served a notice of violation on the within defendants, alleging that the use of the premises as a methadone treatment clinic violated the city’s zoning law, and ordering the clinic to be vacated immediately. The notice was disregarded.
Thereafter, and on or about December 2, 1971, this zoning law prosecution was commenced by the city by the service of an accusatory instrument on the defendants who are the owner-landlord and managing agent respectively of the premises, charging the defendants with violating chapter IV-A (4) of the city zoning ordinance.
The city’s position is that the services rendered by the Mount Vernon Hospital are those carried on by a hospital, and that since hospitals are not permitted in a B-3 General Business District, the zoning law is being violated.
The city zoning ordinance is attacked by the defendants, and also by the Mount Vernon Hospital (which has appeared in this action as amicus curiae) as discriminatory and unconstitutional because it does not expressly permit “ clinics ” in any zoning district.
The defendants also urge that the operations carried on by the Mount Vernon Hospital at 14 East Prospect Avenue come within the purview of other uses which are permitted in a B-3 General Business District.
This court can find no merit in the defendants’ position.
The plain and simple fact is that neither hospitals nor clinics are permitted in a B-3 Business District; and this court specifically finds that the operations carried on at 14 East Prospect Avenue are in fact the operations of a hospital clinic, not those of a professional or personal service office or research labóra *478 tory or medical or dental laboratory or offices and facilities devoted to scientific purposes.
On May 8, 1963, the city zoning ordinance was adopted by the Common Council. It was approved by the Mayor the following day, and became effective on July 1, 1963.
The zoning ordinance is a comprehensive one which followed the earlier adoption on November 27, 1961 by the City Planning Board of a master plan for the entire city.
The said zoning ordinance was enacted by the Common Council pursuant to article 2-A of the General City Law. This was a valid exercise of the police power, i.e., the power of the State, through the municipality, to regulate zoning in the interests of the health, safety, morals, and general welfare of the community.
In its preamble, the city zoning ordinance declares that the legislative intent is to promote the orderly and desirable development of the entire community; to encourage the most appropriate use of lands in order to conserve and enhance the value of property; to create attractive and cohesive central and other business districts-, and to encourage the development and redevelopment of the city with good urban planning. (Italics the court’s.)
Approximately one year before adoption of this zoning ordinance, and specifically on May 31, 1962, the Common Council, by ordinance, approved an urban renewal plan for the Midtown Urban Renewal Project which was then in the planning stages, as a proposed residential high-rise- project with neighborhood convenient stores to be located in the area bounded by East Prospect Avenue on the south, North Third Avenue on the west, Hartley Park on the north, and Park Avenue on the east.
It is to be noted again that the subject premises are located on the same Prospect Avenue and around the corner from the same North Third Avenue, and are therefore in close proximity and in fact diagonally across the street from the said Midtown Renewal Project.
It is also again to be noted,, and the court takes judicial notice of this geographical fact, that there is a major bus terminal just around the corner from the subject premises on Gramatan Avenue, that the city’s main railroad station is just around the corner on the North Third Avenue side of the subject premises, that the city’s main retail shopping center is just across the railroad tracks on Fourth Avenue which is a continuation of Gramatan Avenue, and that the streets surrounding the block in which the subject premises are located have been and still *479 are heavily congested during daylight hours with motor vehicles and pedestrian traffic.
In the light of the foregoing facts, the action of the Common Council in barring hospitals from a B-3 General Business District zone was neither arbitrary nor unreasonable.
Chapter 3 of the zoning ordinance divided the city into 11 zoning districts. The B-3 zoning district, as heretofore stated, encompasses the principal downtown retail shopping area of the City of Mount Vernon.
Chapter IV-A of the ordinance, “ Permitted Uses ”, provides that “No building or premises shall be * * * used except for one or more of the uses designated for any district ’ ’. Although the Common Council authorized hospitals in the A-2 multiple family residential district, the B-l office district, and the B-2 neighborhood business district, nowhere in the list of permitted uses in a B-3 district do the words “hospital” or “ clinic ” appear.
The court specifically finds that the words “ general hospital ” as used in the zoning ordinance include and embody all accessory uses which are customary and appurtenant to a general hospital such as outpatient clinics, and, accordingly, the failure of the zoning ordinance to expressly permit a “ clinic ” does not violate either the State or Federal Constitution.
The court further finds that “ clinics ” are not totally prohibited from all districts in the city; but, in fact, are permissible in any district in which hospitals are permitted since they are an accessory use to a hospital.
The question now before the court is whether the methadone treatment program conducted by the Mount Vernon Hospital since early 1971 in a B-3 zone is, in fact, a hospital operation and therefore not permissible.
Black’s Law Dictionary (1951 4th ed., p. 871) defines “ Hospital ” as an “Institution for the reception and care of sick, wounded, infirm, or aged persons * * * also the building used for such purpose ”.
Webster’s Third New International Dictionary of the English Language Unabridged, defines “Clinic” as: “3a: an institution connected with a hospital * * * where diagnosis and treatment are made available to outpatients ”.
The preamble to the agreement between the Mount Vernon Hospital and the County of Westchester refers to the 14 East Prospect Avenue operation as an “ experimental pilot clinic ”. (Italics the court’s.)
*480 The fact is, and this court takes judicial notice of such fact, that drug addicts are sick or infirm persons.
This is precisely why the New York State Legislature has provided in article 9 of the Mental Hygiene Law of our State that special institutional facilities be made available to persons who have been certified as drug addicts, and why civil commitments of committed drug addicts are authorized by the same law and why, in appropriate cases, dismissal is permitted of criminal charges against accused persons who have been certified as drug addicts.
The principal function of a hospital is to receive and care for sick persons, either on an inpatient or an outpatient basis.
That is precisely the function of the Methadone Maintenance Treatment Center conducted by and under the auspices of the Mount Vernon Hospital, not in a zoning district where it is permitted, but in an area in which it is prohibited by law.
The examination of drug addicts; the taking of urine specimens ; the dispensing of an addictive drug known as methadone to a weekly total of approximately 195 persons, by a staff of 9 persons, all of whom are on the Mount Vernon Hospital payroll, including a physician, a pharmacist, two registered nurses, two social workers, a community worker, and clerical help; coupled with the keeping of medical equipment including an oxygen tank, a blood pressure device, an examination table, hypodermic syringes, and medication “to counter possible adverse reactions to the methadone ”; is, in this court’s opinion, a hospital function which is not permitted in a B-3 zone.
The methadone maintenance treatment program sponsored in our city by the Mount Vernon Hospital is motivated by a worthy objective of returning to society functioning individuals who before methadone had become useless not only to themselves but to society as well.
While this court supports methadone maintenance programs and encourages their expansion as a rehabilitative factor, the program which involves therapy to veteran drug addicts should be carried on within the framework of and subject to the zoning laws of this community.
The defendants are found guilty of permitting the subject premises to be used as a Methadone Treatment Clinic in violation of chapter IV-A (4) of the city’s zoning ordinance.
The defendants will be sentenced at 10 a.m., on March 31, 1972, at which time they are to appear in court.

. Pioneered in New York beginning in 1964 by Drs. Vincent Dole and Marie Nyswander, the methadone maintenance program involves switching an addict from heroin, which can cost $50 or more a day on the black market, to methadone, a synthetic substitute that can be made available legally for about 15 cents for a day’s dosage. Administered as part of a total rehabilitation program involving counseling and therapy, methadone eases heroin withdrawal and blocks heroin’s euphoric effects. This enables an addict to function normally and hold a job, something that few heroin users can do. But methadone itself is addictive, which means that those who use it must either be helped to taper off from the synthetic, or continue their habit for the rest of their lives.