**UNITED STATES of America,**
**Plaintiff,**

v.

**Elvin Lee BYNUM et al., Defendants.**
**No. 71 CR 1169.**

United States District Court,
S. D. New York.

June 6, 1973.

Paul J. Curran, U. S. Atty. S. D. N. Y., by W. Cullen MacDonald, Asst. U. S. Atty., for plaintiff.

Henry J. Boitel, New York City, for defendant Bynum, of counsel to defendant Nedd.

Patrick M. Wall, New York City, for defendants Cordovano, Wright, Birnbaum, Feroldi, Mitchell, Small, Garnett, Dyson and Nedd.

Aaron J. Jaffe, New York City, for defendants Wright, Small, Mitchell and Birnbaum.

Kenneth Salaway, Kew Gardens, N. Y., for defendants Wright, Small and Meli.

Frederick T. Stant, III, Norfolk, Va., for defendants Garnett, Dyson, Feroldi and Nedd.

H. Elliot Wales, Olshan, Grundman & Frome, New York City, for defendants Coniglio, Tuzzolino and Meli.

Frank Lopez, Brooklyn, N. Y., for defendant Altamura by Salvatore Canonico, Corona.

Levis Nedd, pro se.

Herbert I. Handman, New York City, for defendant Bynum.

## FINDINGS AND OPINION

POLLACK, District Judge.

This case is presently on appeal from the conviction by a jury of 14 defendants of conspiracy to violate the narcotic laws and the conviction of appellant Nedd of carrying a firearm during the course of that conspiracy.

The government presented evidence at the trial of seven brief conversations which were electronically intercepted by an authorized telephone tap of phones located in the headquarters of the narcotics enterprise. The defendants are contending on their appeal that the management of the wiretap violated the stand-

ards for interception of oral conversations over a telephone and that the government consequently overheard conversations unrelated to the authorized purposes of the wiretap, albeit not used on the trial.

■ After hearing argument, the Court of Appeals, 2 Cir., 475 F.2d 832, remanded the case to the District Court for an evidentiary hearing and findings on the issue whether the electronic surveillance was conducted so as to minimize interception of communications not subject to interception under the statute.[1] Meanwhile, jurisdiction of the matter was retained by the appellate panel.

The required hearings on the inquiry by the Court of Appeals have been duly held in the District Court. The Judge who authorized and supervised the wiretaps (Hon. Anthony J. Travia), the Assistant United States Attorney in charge (Charles B. Updike), a monitoring agent and a narcotics agent who had analyzed the tapped data, as an aid to the Court, were examined and cross-examined. (One of the inspectors in charge, Bitzer, had already been examined and cross-examined on the wiretap at the trial.) The documentary evidence adduced included the wiretap orders, the regular reports to the supervising Judge from the United States Attorney in compliance with the orders, and the logs kept by the monitoring agents.[2] The reports

to Washington as required by statute as well as the inventory and sealing orders and a copy of guidelines issued by the Department of Justice to its attorneys were also introduced. The parties also presented data which really amount to briefs, i. e., such items as the defense analysis of the taps, statistics compiled by the defense, summaries by the defense of selected calls; and contentions of the prosecution, and the analyses made by the prosecution of the evidence.

One fact stands out from the paper weight of all of the foregoing and that is, that the supervising Judge, the government attorney in charge and the agents showed a proper awareness of, sensitivity to and reasonable regard for the right of privacy. They did what under the circumstances was reasonable and understandable in the investigation of this far flung and widely ranging narcotics conspiracy case to ferret out and identify the violators and their part in the crime and the involvement with them of corrupt law enforcement officers. The statutory mandates for the authorization and conduct of wiretaps were legally observed. There was compliance in fact under the circumstances of this case with the statute and the directives from the Judge included in his written orders and verbal instructions to minimize to the extent reasonable the overhearing of unrelated and privileged matter.[3]

1. Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. (hereinafter the "Act" or "statute").

2. The transcripts of the respective conversations of the defendants which were overheard had been furnished to them by the government before the trial; no other transcriptions were made by the government. Only a few out of all the defendants were overheard. Transcripts of the remaining calls were not provided to the Court with the exception that defendants furnished, with their post-hearing brief, transcripts of selected calls recorded said to involve attorneys and allegedly privileged.

3. It should be noted that none of the calls introduced into evidence on the trial of

this case were either improperly intercepted or privileged communications. The taps introduced in evidence were calls numbered Q335 (recorded 2/20/71); W1880 (2/22); W2312 (2/28); Q664 (2/28); W2463 (3/1); W2485 (3/1); Q761 (3/1). Moreover, no criticism can validly be levelled at any of the intercepted conversations which were transcribed by the government—the inculpatory nature of these with picayune exceptions is patent. The challenge here is that a number of other calls intercepted were unrelated to the investigation and consequently were overheard in violation of the statutory requirement of minimization. Apart from the possibility of criminal and civil liabilities provided in the Act for listening to unrelated matter, 18 U.S.C. §§ 2511, 2520, it has been held that sup-

## I.

■ A review of the validity of an electronic surveillance must include a determination of the perspective with which the investigating agents proceeded. The legitimacy of a search and seizure is neither established nor negated by a post-investigation analysis of what was produced by the search and seizure. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The focus, rather, is on the reasonableness of the procedures employed by the investigators, *supra*. Essential to a constitutionally permissible intrusion into an individual's protected privacy is the presence of facts and circumstances which provide the investigators with probable cause to believe that individual is implicated in a criminal enterprise. Probable cause must exist as of the time of the intrusion, and the results of the investigation—which naturally informs the hindsight analysis of judges and lawyers —are not to be considered. With wiretaps, however, the degree of probable cause existing during the course of an investigation may fluctuate, since the growing amalgam of information received during the tap more sharply defines the skeletal data, inferences and sophisticated suspicions with which the investigation began.

Sometime in January 1971, Inspector Thomas P. Taylor of the Bureau of Narcotics and Dangerous Drugs (BNDD) came to Assistant United States Attorney Charles B. Updike who was then in charge of the Narcotic Unit in the office of the United States Attorney for the Southern District, with information suggesting that Elvin Lee Bynum was successfully operating a far flung narcotics trade, buying from and selling to numerous unknown co-conspirators, with the affirmative aid, counsel and protection of local and federal law enforcement officers, agents and their supervisors. Bynum's corruption of law enforcement officers as part of his narcotics empire had apparently reached such proportions that BNDD's internal investigations unit, the Office of Inspection, was galvanized to undertake a broad scale inquiry, involving interviews with numerous witnesses and examination of extensive documentary materials.

Moreover, prior investigations had obtained a taped record tending to implicate certain attorneys as potential co-conspirators in Bynum's venture, and tending to show that they were serving to advise Bynum, and those associated with him, how the conspiracy might best be conducted to serve their joint ends.[4]

Bynum's illicit activities reportedly centered in Brooklyn, New York and ranged outward to Boston, Baltimore, Washington, areas of Virginia and Atlanta.

The criminality believed to be included as adjuncts to the acquisition and distribution of narcotics, allegedly involved numerous murders, robberies ("take-offs" of other drug dealers), thefts, possession of stolen property, the use of lethal weapons, bribery and the obstruction of justice.

Bynum's past record included a federal narcotics offense. He was well schooled in narcotic law enforcement techniques including the use of electronic eavesdropping equipment. Latterly he had served as a government narcotics informer through which he had cultivated the acquaintance of nar-

pression of improperly seized calls is the relief to be afforded for excessive surveillance. United States v. Cox, 462 F.2d 1293 (8th Cir. 1972) ; United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa. 1971) ; but cf. United States v. Scott, 331 F.Supp. 233 (D.C.D.C.1971). That was accomplished herein without a formal suppression order through the omission of the government to make any use thereof.

4. The transcript of such a tape recording involving certain attorneys and certain of the co-conspirators in this case was made a public record in a trial before Chief Judge Edelstein. The conviction in that case was affirmed from the bench, United States v. Wollack, (2d Cir. 1972) (without opinion), cert. denied, 410 U.S. 982, 93 S.Ct. ·1493, 36 L.Ed.2d 177 (1973).

cotics agents, local law enforcement officials, telephone company employees and others. Conversely, the agents were aware of Bynum and how he operated. He was sophisticated in the field and presented a uniquely difficult and subtle law enforcement problem.

The BNDD requested the procurement of authority to "bug" Bynum's Linden Boulevard, Brooklyn premises together with a simultaneous wiretap installation on what was believed to be the only telephone located there. The tandem eavesdropping was to be able to decode otherwise largely indecipherable telephone conversations far sooner and more effectively than was possible by the clumsy and slower traditional methods of analyzing superficially innocent and coded conversation conducted in an argot and of dissecting these with surveillance and follow-up investigations.

Following these discussions with BNDD inspectors, Updike began to formulate a program for oral and wire surveillance and to plan for obtaining authorization for electronic interception.

Updike's decisions concerning the manner in which the surveillance, if authorized, should be executed were reasonably postulated on his perception of the following additional facts and assumptions:

The premises at 855 Linden Boulevard, where the phones subsequently tapped were located, had been identified by government agents as the nerve center of a massive criminal operation. All contemporaneous indications were that nearly everyone who came and went to those premises was criminally involved in the illicit activities. In furtherance of the operation of the enterprise, its members predictably would endeavor to use a telephone for business (communication). While Mae Garnett was known to live in the premises with Bynum's infant son, her use of the telephone was not thought to deviate to any practical extent from the policy of restricting social usage of the telephone.

Updike reasonably predicted certain problems, prospects, and requirements inherent in electronic surveillance and in equipment used therefor. Such postulates affected the plans he devised for the interceptions. The listening post needed to be located near the target premises due to range limitations of the radios available for communication with visual surveillance teams in the field. Use of pen register devices required time to decode the symbols for the number called, and this would impede the listening endeavor whenever simultaneously attempted.

In monitoring telephone communications the foreseeable problems included at the beginning of any call, speaker or voice identification and simple word identification arising out of dialectical habits; these would require an initial listening of a few minutes to achieve necessary orientation. It was believed that all telephone conversations overheard through the "tap", would be, no matter how illicit the actual message conveyed, innocent superficially. Many illicit telephone communications could be decoded if followed by discussions of the true contents of such calls which would be electronically intercepted. The remainder would prove either decipherable by the agents, with or without informant consultation, or simply forever undecipherable. The character of calls as innocent or as illicit would be similarly determined as best as possible.

In planning for the conduct of the upcoming electronic surveillance, Updike carefully considered, among other things, the statutory minimization provision, 18 U.S.C. § 2518(5). In evaluating the effect of this provision, in addition to talking with his colleagues in the United States Attorney's office, he studied the handbook issued in 1969 by the Department of Justice on their notions at that time for the conduct of electronic surveillance. To the extent that this publication contained instructions, it could be expected that government attorneys would be guided thereby. How-

ever, these guidelines were not in any sense "regulations", as the defendants presently assert,[5] and clearly their directives would have to give way to the instructions and order of the supervising Judge.

Aside from quoting the statutory language, the guidelines on minimization contained in the handbook consist of no more than a discussion of the applicability to public telephones of the minimization requirement. This allusion undoubtedly stemmed from the circumstance that one case which brought on the statute, Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), involved a telephone booth surveillance. That situation is patently distinct from the situation presented herein. The discussion in the guideline reads:

> If interception of the subject's telephone calls from a public booth is authorized, the device must be turned off when the subject is not using the booth. Violation of this section [18 U.S.C. § 2518(5)] will subject the agents conducting the interception to civil suit by the parties whose conversations were intercepted when the subject was not present (§ 2520). (MANUAL FOR CONDUCT OF ELECTRONIC SURVEILLANCE UNDER TITLE III OF PUBLIC LAW 90–351, § 10.4, p. 47 (Dept. of Justice, Washington, D.C. 1969)).

. Updike concluded even before the orders so stated, that the statutory requirements, including minimization, were applicable to the proposed surveillance and that a reasonable and practical compliance plan was necessary.

Accordingly, Updike adopted the following plan as adequately safeguarding all rights of the persons involved as best as possible in the context of the investigation necessarily defined by the scope of the criminal enterprise: (1) No listening to or recording of privileged communications would be allowable, even though authorized under the Act and the contemplated warrants (See 18 U.S.C. § 2517(4)), and any such calls were to be brought to Updike's attention on a forthwith basis; (2) officers would record all interceptions; (3) the monitoring agents would be free to use their best judgment in deciding if a given call need not be listened to, except on a spot monitoring basis to see that the party and topics remained unchanged; (4) the officers would make a record or log of all conversations and transcribe only those having a high probability of being drug-related; (5) the logs and transcripts so made would be (a) delivered to Updike for his use in determining if there developed any pattern of innocent calls, objectively identifiable as such, and (b) used by the investigating team to isolate, by decoding and otherwise, the evidentiary value of the surveillances; (6) access to the logs, transcripts and the tape recordings would be rigidly controlled on a need-to-know basis so as to minimize the possibility of untoward usage, i. e., "virtually no publication of them of any kind", and (7) comprehensive, full and complete periodic reports would be made to the Court throughout the execution of the warrant to insure the continued actual control of a neutral magistrate.

After consultation with the United States Attorney, Updike gathered the relevant data and sought the required approval from the Attorney General. 18 U.S.C. § 2516.

Upon receipt of the Attorney General's approval, Updike presented the government's application to Circuit Judge Leonard P. Moore. Judge Moore indicated that he would sign the warrants; however, during a discussion of the ex-

---

5. On the hearing, Mr. Wall acknowledged. that the guidelines were not "regulations" of the Department.

The copy of the 1969 guidelines made part of the record herein reveals no amendments reflecting developments in the case law; if the guidelines were to have the operative significance suggested by defendants, such changes and other updating might be expected.

tent of judicial control necessary to the execution of the warrant, he concluded that his being away part of the contemplated period would impair satisfactory supervision. Thus, he suggested that the Honorable Anthony J. Travia, United States Judge for the Eastern District of New York, where the target house was located, might be preferable for the assignment. Finding that Judge Travia would be available throughout the period, the application was referred to him.

On January 29, 1971, Updike and Inspectors Taylor and Bitzer met with Judge Travia to submit the application. Judge Travia testified at the hearing that he was thoroughly briefed concerning the background of the investigation, the planned surveillance, its purpose and its projected problems. His decision to authorize a wire and an oral interception was based not just on the papers submitted to him, but more fundamentally resulted from his close questioning of the government representatives who came before him. The discussion included a consideration of the likelihood that certain attorneys would probably be surveilled, and Judge Travia made particular efforts to satisfy himself that privileged communications likely would not be intercepted; the suspected role of attorneys in the Bynum operation and the character of anticipated conversations were carefully reviewed. The earlier tape recording mentioned above confirmed the probability that lawyers were co-conspirators in "that there was no instance in which they were giving what could properly be deemed legal advice" to Bynum.

The orders issued by Judge Travia responded to the breadth of the conspiracy under investigation, but were designed to limit the invasion of privacy which necessarily would result from the surveillance authorizations. While making an express provision in the order requiring minimization, he also insisted on the need to minimize the interception of unrelated calls in his supplemental oral instructions; he ordered the agents to use their best judgment and discretion in the endeavor to fulfill the minimization requirement. This grant of discretion subject to his supervision reflected Judge Travia's recognition of the scope of the criminal enterprise involved herein, of the use made of the premises surveilled, and of the experience and reliability of the personnel assigned to this surveillance. Judge Travia specifically concluded that this investigation did not involve an ordinary situation, but rather represented a broad attack on an exceptionally extensive criminal operation.

I find that the oral directives of the Judge and the oral communications to the Judge were appropriate and occurred as recounted in the testimony of the witnesses. Their testimony was credible and corroborated by other testimony, documents, inferences and circumstances. There was nothing incomplete or misleading that was conveyed to the Judge by the inspectors or the Assistant United States Attorney. Such reports are not trust indentures, securities registrations or testaments where repleteness is required and expected; sufficiency and prolix detail are not to be equated as standards for satisfying wiretap obligations.

The January 29 order, which was implemented on January 30 with the installation of the first wiretap herein, authorized oral surveillance of the premises by an electronic listening device ("bug") and the interception of telephone calls made and received over phone 212–342–6203 (hereinafter "phone one"), located at 855 Linden Boulevard in Brooklyn, for a period of 20 days. By order dated February 18, 1971, Judge Travia extended this authorization for wire interception for a further period of fourteen days. The wiretap on this phone was shut down for a period of some 17 hours on February 17–18, between the expiration of the original authorization and the effective implementation of the extension order.

Before the first tap was installed, Bynum learned of the planned surveillance, and he had another telephone in-

**408**

stalled inside the premises. When the tap on phone one commenced, the agents overheard many calls being referred to a different number. This impeded achievement of the objective of the surveillance and led the government to apply for authorization for a second tap. Judge Travia entered a third order dated February 12, 1971, which authorized the interception of phone conversations over line 212–346–5992 (hereinafter "phone two"), located at the same premises, for 20 days; this order replaced the authorization for the oral surveillance.[6]

The tap on phone two commenced February 13, 1971. The authorization to intercept wire communications on each phone expired March 3, 1971, on which date the taps were ended. The interception on phone one lasted 34 days, and on phone two 20 days.

Each order made by Judge Travia authorized the interception of calls which would reveal the details of the scheme which had been and was being used by Elvin Lee Bynum and others then unknown, to receive, conceal, buy, and sell illegal narcotic drugs, and to engage in the bribery of public officials, and which would reveal the identity of his confederates, their places of operation, and the nature of the conspiracy involved therein.

The terms of these orders, and the circumstances underlying their issuance, appear on this record to be, in all respects, proper and in conformity with 18 U.S.C. §§ 2516 and 2518.

**II.**

Before considering the operation of the wiretap and the results it achieved in order to find the facts relevant thereto, it is necessary to view the minimization requirement in its proper perspective.

An order issued pursuant to 18 U.S.C. §§ 2516 and 2518 authorizing the interception of telephonic communications does not warrant an indiscriminate monitoring of each and every call transmitted over the line under wire surveillance. United States v. King, 335 F. Supp. 523 (S.D.Cal.1971), rev'd 478 F.2d 494 (9th Cir. 1973) (on other grounds); United States v. Scott, 331 F.Supp. 233 (D.C.D.C.1971); cf., Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L. Ed.2d 1040 (1967). The Act specifically provides that:

> Every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to *minimize the interception* of communications not otherwise subject to interception under this chapter. § 2518(5). (Emphasis supplied).

"Intercept" is a term defined by the Act as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." § 2510(4). This definition clearly equates "interception" with the listening to, monitoring, or hearing of described communications, either at the time such communications occur or at a subsequent time through the use of electronic means, such as a playback tape recorder. Recording a communication which has not been heard by government agents and storing that recording so that it will not be heard, unless demanded by the parties involved in the conversation, does not constitute an interception under the terms of the Act.[7] Section 2518(8)

---

6. While the government believed electronic surveillance of the premises would facilitate this investigation and Judge Travia determined probable cause existed to authorize a bug, the agents found it impossible to "plant the bug"; the risks to the safety of personnel led to a decision to forego this aspect of the investigation.

7. Apropos *recording* of conversations, *Cf.* Berger v. New York, 388 U.S. 41, 98, 87 S.Ct. 1873, 1903, 18 L.Ed.2d 1040 (1967) (Harlan, J., dissenting: "[I]n my view, conversations are not 'seized' . . . by their *recording* so that they may later be heard at the eavesdropper's convenience."); 388 U.S. at 108, n. 1, 87 S.Ct. at 1909 (White, J., dissenting:

(a) confirms this distinction between intercepting and recording a communication, stating:

> The contents of any wire or oral communication *intercepted* by any means authorized by this chapter shall, if possible, be *recorded* on tape or wire or other comparable device. (Emphasis supplied).

In fact, this section encourages the recording of calls—with specific procedures for sealing and storing the tapes produced—for the protection of the individuals whose conversations are subject to interception and recording and for guarding against editing and later claims of distortion of segments of the tape.

Accordingly, the minimization requirement of § 2518(5) must be read as requiring the authorization to intercept to be conducted in such a way as to minimize the *monitoring or the hearing* of communications not subject to interception under the Act.[8] The "evil" to be limited by this requirement is the listening to innocent calls.

The Act does not mandate means to be used in each case to achieve minimization, nor should it be read to set absolute standards for every search. The Court, guided by existing case law,[9] must determine from the structure and purposes of the Act, the scope of this statutory requirement for the particular case at hand.

Minimization does not insure that no protected communication will be intercepted. The statute is not necessarily violated when some unrelated or innocent calls are intercepted. In enacting this provision, Congress clearly anticipated that a number of such calls would be overheard. United States v. LaGorga, 336 F.Supp. 190, 196 (W.D. Pa.1971). Nor is the statute violated if some intrusion into an individual's privacy can be observed; any interception —no matter how proper and restrained —represents an intrusion.

The minimization provision should be seen as requiring a limiting process. Law enforcement officials, under supervision of a Court, must exercise their authority to intercept communications in a manner which will reduce unnecessary monitoring of innocent calls. Procedures must be adopted and followed which will result in a conservation, as best as is possible of the right of privacy within the context of authorized investigatory activities. *See* Berger v. New York, 388 U.S. 41, 53, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). The requirement is satisfied if the Court on review of the government's procedures concludes, in the light of all facts and circumstances of the case, that "on the whole the agents have shown a high regard for the right of privacy and have done all they *reasonably* could to avoid unnecessary intrusion." United States

---

"*Recording* an innocent conversation is no more a 'seizure' than occurs when the policeman personally overhears conversation while conducting a search with a warrant.") (Emphasis supplied).

8. Such calls not covered by the Act are referred to herein as innocent or unrelated calls. For a particular case, the order authorizing the interception provides the boundaries for relevant calls; the scope of the order accordingly is a factor to be considered in ruling on minimization.

9. The requirement of minimization has been considered by the following courts: United States v. Fino, 478 F.2d 35 (2d Cir. 1973); United States v. Tortorello, 480 F.2d 764 (2d Cir. 1973), aff'g 342

F.Supp. 1029 (S.D.N.Y.1972) (Pollack, J.); United States v. Cox, 462 F.2d 1293 (8th Cir. 1972); United States v. Lanza, 349 F.Supp. 929 (M.D.Fla.1972); United States v. Mainello, 345 F.Supp. 863 (E.D.N.Y.1972) (Travia, J.); United States v. Focarile, 340 F.Supp. 1033 (D.Md.), aff'd, sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972); United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa.1971); United States v. King, 335 F.Supp. 523 (S.D. Cal.1971), rev'd, 478 F.2d 494 (9th Cir. Feb. 28, 1973) (on other grounds); United States v. Leta, 332 F.Supp. 1357 (M.D.Pa.1971); United States v. Scott, 331 F.Supp. 233 (D.D.C.1971); United States v. Sklaroff, 323 F.Supp. 296 (S.D.Fla.1971).

v. Tortorello, 480 F.2d 764 (2d Cir. 1973) (Emphasis added).

█ This focus on reasonableness necessarily forces a case-by-case analysis. United States v. Cox, 462 F.2d 1293, 1300 (8th Cir. 1972); United States v. Focarile, 340 F.Supp. 1033, 1047 (D.Md.1972), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972); United States v. Leta, 332 F.Supp. 1357, 1360 (M.D.Pa.1971). A review of reasonableness primarily involves a careful appraisal of circumstances and not merely a mechanical deference to the suggestive weight of statistics. Even the fact that 100% of the calls made or received during the limited period of surveillance were intercepted, if this were established, though significant, should not be overestimated. The determination of whether minimization was achieved in a particular case requires close scrutiny of, *inter alia*, the type of criminal enterprise being investigated; the scope of that enterprise and the number of participants, known and unknown, involved therein; the number of days for which electronic surveillance is conducted; the scope of the authorizing order; the activity on the phone(s) being monitored; the number of calls; the number of monitored calls; the location of the phone(s); the length of calls; the participants in those calls; the content of calls as reasonably perceived at the time of the tap; the experience of the agents deployed for the investigation; the various pressures on the agents executing the investigation; the procedures planned and/or followed to monitor calls; the equipment employed in the surveillance; and, most of all, the supervision of the interception by the investigating agency, the supervising attorney, and by the authorizing Court.

A vital aspect of the minimization requirement—perhaps the most vital—is the degree of supervision over the surveillance provided by an impartial judicial officer. Close scrutiny by a federal or state judge during all phases of the intercept, from the authorization through reporting and inventory, enhances the protection of individual rights within the context of an extreme, yet essential law enforcement activity. Such scrutiny is basic to the structure and the constitutionality of the Act. United States v. Tortorello, 480 F.2d 764 (2d Cir. 1973). The scope of surveillance is likely confined to reasonable bounds where the agents must systematically and continually explain their conduct to a judge, seek his approval for further interceptions, and conform their actions to his detailed instructions. See United States v. Cox, 462 F.2d 1293 (8th Cir. 1972). Indeed, even if the judge does not provide particularized guidelines beyond the terms of his order, the need to answer to an independent official sets the tone of the surveillance. Where the judge carefully studies the reports submitted to him, reviews all details told to him, and provides an active supervision of the interception, the rights of affected individuals are most likely to be safeguarded.

Moreover, it must be remembered that minimization is only one element of the composite group of statutory safeguards included in the Act. §§ 2516–2518.

In trying to frame a statute which would avoid the defects specified in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), where the Supreme Court struck as unconstitutional the New York wiretapping statute, Congress required, in addition to minimization, particularized procedures for obtaining authorization, for supervising the tap, and for reporting to individuals the use of a tap. See Senate Rep. 1097, 1968 U.S.Code & Adm.News, 2112. The whole package was aimed at limiting improper intrusions into privacy, *id.*, and all the provisions must be followed. The totality of circumstances, from which the determination of reasonableness is to be drawn, includes the degree of compliance with the package of the statutory terms as a whole as well as the problems and the objects of the investigation.

### III.

The entire investigation of Bynum and his coconspirators, including the wire surveillance authorized by Judge Travia, was directed by Inspector Taylor, who was assisted by Inspector John Bitzer. Assistant United States Attorney Updike was the supervising attorney for the wiretap, with general responsibility over the conduct of that surveillance. Taylor and Bitzer maintained close day-to-day supervision over the tap, directing the work of the monitoring agents, acting as intermediaries between these agents and Updike and Judge Travia, and keeping custody over the tapes and line sheets. Updike, Taylor and Bitzer were all "investigative or law enforcement officers," 18 U.S.C. § 2510(7). Judge Travia, as further discussed *infra*, was supervising judge and kept an active and constant watch on the progress of the tap.

As indicated above, the government was certain that others than Bynum might also use the telephone but the government did not know any categories of persons who would have occasion to be in that house and use the phone, who would not be somehow related to the illegal activities.

Accordingly, when the surveillance commenced, Updike—through Taylor and Bitzer—directed the agents to record all calls, except privileged communications. At the outset of the tap, no other categories of excludible calls had been devised. The reason for this was stated by Updike at the hearing:

We were concerned that there should be a full record with respect to all calls for two fundamental reasons. One was the protection of any innocent parties involved in the interception and the other was a preservation of the calls themselves so that there could be no accusation at a later time that the government had made selective recordings in the conduct of this investigation, and that was the original basis of the decision, coupled with the fact that as of that time, from

what we knew about the premises and use of the phone and the persons who occupied the premises, that there was no ascertainable pattern in advance of persons who would be using the telephone who, in essence, had nothing to do with this investigation . . .

We felt that the rights with respect to privacy of any of the persons would be protected by the procedure of taking these recordings and sealing them and having virtually no publication of them of any kind, except insofar as they bore upon the investigation so that there were a great deal of calls which, as you know, were never transcribed.

The wiretap was actually manned by six inspectors of the BNDD. Due to the sensitive nature of this investigation, which involved not only a massive drug conspiracy but also possible internal security problems in the BNDD and in other law enforcement departments, it was decided to use only personnel of inspector rank to conduct this surveillance. Inspectors were brought in from regional offices outside of New York for this purpose.

Before starting to monitor calls, the inspectors were informed of the nature of the investigation, including the possible internal security matter and including the name Bynum, and were told to record all but privileged calls.

At the hearing, Francis J. Pryal, who was one of the BNDD inspectors manning the tap, and Updike described the procedures actually followed pursuant to Updike's instructions.

The wiretap was operated from a "listening post" established approximately three miles from Bynum's narcotics factory at 855 Linden Boulevard. The post was equipped with a two-way car radio, to enable the monitoring agents to relay information to other personnel engaged in a contemporaneous visual surveillance operation. Two telephones were installed, so that the inspectors could be in constant touch with Taylor, Bitzer and Updike. To conduct the wire surveil-

lance, two tape recorders were deployed for each tap, and two additional recorders were provided to enable preparation of one copy of each tape. To allow actual interception of calls, two sets of headphones were connected to each tap. Additionally, there was a pen register attached to each tap, which recorded the numbers dialed on outgoing calls; digital clocks were placed in the view of the agents. The agents worked twelve hour shifts; Pryal worked 60 hours each week. While on duty, the agent sat in front of the recording equipment, with a note pad nearby and with the headphones resting on his shoulders. Tape recorders were connected to the taps and the pen registers operated automatically. Whenever the telephone line was opened on a tap—that is, the receiver was picked up or an incoming signal was received—a tape recorder was activated and a red light went on; the machine would remain in operation until the line was closed (receiver placed in cradle or ringing stopped). When a tape was filled, the agent would switch on the second recorder for the tap, and recording continued. Except for periods when equipment malfunctioned, all calls were recorded. The machines could be turned off and were de-activated by the agent if a phone was left off the hook for a prolonged period.

When the red light went on and the recorders activated, each agent of the two man team would put his headphones in place and begin intercepting the call. During the call, he would make some notations about the call. After the call was completed, one agent would make an entry on a line sheet for this call. The time of the call and its completion, the position on the tape, and remarks about the content of the call would be entered.

A mark might be entered next to the report of especially relevant calls; "N" would designate a narcotics related call, "IS" an internal security related call; transcripts were prepared for some of these calls.

Logs were maintained for every call and were prepared in duplicate. A book of cumulative original logs was maintained at the post, and a book of the copies kept at BNDD headquarters. A photocopy of the logs was prepared for Judge Travia.

When a tape was filled, and an agent had switched the system over to a second recorder, one copy of the completed tape would be made. The same team that manned the recording also produced the copy. The original of the tape was marked with the names of the agents making the tape and its copy and with the date and was sealed; the copy was similarly marked. Taylor and Bitzer had custody of these tapes, until they were delivered to and sealed by Judge Travia.

At the outset of his monitoring, Pryal found it to be difficult for him to understand all the argot used in the conversations and to recognize the participants of the calls. Even when particular calls were transcribed, it was often necessary to replay the tape several times to decipher words. The process of voice identification often required multiple calls involving a party, and occasionally some parties could not be identified. References to locations were troublesome, especially to inspectors from other geographical regions who were unfamiliar with the Brooklyn area; a wall map was hung to aid in this connection.

More basic, the inspectors detected that word codes and guarded language [10]

10. The guarded language is reflected in the following:
Bynum: Hey'd you ever hear anymore from them people?
Stan [Sherman]: Which ones Al?
Bynum: That you were talking about.
Stan: You mean what I saw you about?
Bynum: Yeah. (Call W1889)

Cordovano: Yeah. That other fellow didn't call over, huh?
Bynum: Yeah he came past here.
Cordovano: Yeah.
Bynum: Yeah.
Cordovano: Did he give you anything?
Bynum: No. I'll tell you when I see ya.

were employed by the speakers to hide the true meaning of conversations. It was suspected that the codes adopted related to items sold in Bynum's other business enterprises, for example, his clothing store, although other codes were sensed as well. Calls that may on their face have appeared innocent were accordingly monitored; and as the investigation proceeded, the intended meaning of earlier calls dawned on the agents.

Certain types of calls could be recognized after the monitoring progressed. Specifically, a number of calls involved one who turned out to be a teenager named Donna, who was frequently present in the house. Some of her calls were highly relevant, as she often served as a message service for co-conspirators; these calls were intercepted. However, there were a number of calls between Donna and her teenage friends, often long calls, involving unrelated subjects and containing no investigatory leads. Pryal testified that, after a time, he would drop his headphones during such calls, thereby not intercepting them. *See* 18 U.S.C. § 2510(4). The red light and the activated tape recorder enabled him to know if a call was still in progress. Occasionally, as the call continued, he would spot check by putting the headphone over one ear to listen and to determine if the parties to the call had changed.

The monitoring agents determined while a call was in progress whether to intercept it. Aside from the non-intercepted "Donna calls," Pryal stated that he dropped his headphone at other times, citing when called on for an example a call between Mae Garnett, a co-conspirator convicted herein, and a friend of hers, which appeared to be an innocent call.

During the course of the surveillance about 10% of the conversations that took place during Pryal's shifts were not intercepted; he did listen briefly to some of each call, in order to identify the parties, to recognize the nature of the conversation, and to spot check if the parties changed but did not intercept beyond this. He could not recall if his partner stopped intercepting a call at the same time Pryal did.

Although when a copy was made of a tape, an agent could potentially listen with an earphone to a previously unmonitored innocent call, this did not occur. The agents who originally manned the recording of a tape made the copy and at this point could therefore avoid and did avoid intercepting the unrelated calls.

It was stipulated that, if called as witnesses, each of the other inspectors monitoring calls would have testified to the same effect as Pryal. The percentage of the actual conversations that were intercepted was thus approximately 90%.

During the course of the surveillance, primary and continuous direction was properly provided by Inspectors Taylor and Bitzer. Updike was kept informed on all developments and remained in close touch with the inspectors. Depending on the week and on the activity at the post, Updike received five to twenty calls per week from the inspectors and made five to six calls to them. On occasion, Updike would visit the listening post, to glean a first hand impression of the conduct of the interception. Updike received and read the logs prepared by the monitoring agents, before these were routed to Judge Travia, along with the required reports which he prepared and signed. He looked at every page of the logs and examined particularly those entries which the inspectors had indicated were significant. He looked to see who was calling whom, at what numbers, how often and what was being said, what was in the conversations and what was not in the conversations and how well the tap was serving the purpose of the investigation. He became aware of the frequent users

Cordovano: Oh. All right well I'm still waiting, eh.
Bynum: All right.

Cordovano: The boy is out.
Bynum: I'll tell you. (Call Q707)

of the phones (e. g., Donna) and of the degree to which the calls of such persons would be intercepted. When further information was required, he would consult the inspectors.

The Court finds that Updike satisfactorily fulfilled the function of a supervising attorney; he designed the plan for the wiretap and determined that his plan and Judge Travia's orders were being followed.

Updike prepared and submitted written reports to Judge Travia dated February 4, 8, 16, 18, 24 and March 1 and 8, 1971, which summarized the progress of the interception. The letters, accompanied by detailed line sheets of the calls (logs), were hand delivered to Judge Travia by Updike, Taylor, and/or Bitzer on or about the respective date of the particular report. Whenever preparation of a written report was delayed, Updike reported to the Judge by phone and subsequently provided the written report. Each report analyzed an approximate four-day period,[11] stating the days covered, the times in which equipment was inoperative, the number of calls intercepted, the number of calls apparently related to criminal activity, the number of intercepted privileged calls, and specific information learned from certain calls. The logs gave more particularized information, itemizing the time and length of each call, the parties involved, if identified, and the nature of its content. These reports more than adequately fulfilled the five day reporting requirement of Judge Travia's orders, and provided sufficient information from which the judge could determine compliance with his orders and the Act.

Equally significant to these written reports were the supplemental oral discussions and meetings between Judge Travia and the agents which explored the matters in detail and in their full perspective. Judge Travia, who was called by defendants as a witness, stated that having carefully reviewed all reports submitted to him, he asked questions to be certain he fully understood what was transpiring. In supervising the investigation, he was aware of the minimization requirement but recognized the problems inherent in this particular case. He testified that the conspirators "were so far-flung and it involved so many that it was very difficult to say that 'You can't listen to certain parties.' You have to give them [the agents] some latitude because here I am dealing with not the ordinary type of agent. . . . I was talking to agents who knew what it was all about, and in discussing this with them I wanted to make sure that they were aware of the minimization rule, and all the other things that might come up, such as the attorney-client relationship." He perceived this as an extraordinary investigation, permitting greater latitude and discretion, once he was confident that this was required and that his orders were being followed.

During the course of these closely-timed frequent discussions, the problem of calls involving attorneys was raised. The extent of attorney-client confidentiality was considered, as was the possible involvement of certain attorneys in illicit activity. Judge Travia was very particular in reviewing whether privileged communications were being overheard.

The record conclusively establishes that Judge Travia carefully and actively supervised the surveillance authorized by his orders and that he was especially concerned about assuring compliance with the minimization rule and about protecting privileged communications, when they could be so regarded. His

---

11. The reports covered the following periods: Feb. 4 (Jan. 30–Feb. 2); Feb. 8 (Feb. 3–Feb. 7); Feb. 16 (Feb. 8–Feb. 12),; Feb. 18 (Feb. 13–16, for phone two); Feb. 24 (Feb. 12–Feb. 22, for phone one; Feb. 17–Feb. 22, for phone two); March 1 (Feb. 23–Feb. 27, for phone one and two); and, Mar. 8 (Feb. 28–Mar. 3 for phone one and two). Additionally, written information was contained in the applications for the orders of February 12 and 18.

testimony, as well as his order extending the initial tap, make clear that he found the minimization effort reasonably satisfied in the context of this case.

 Such a determination by the supervising Judge, who faced the problems of the interception contemporaneously with its execution, must be afforded great weight when called into question on a taint hearing. *Cf.* United States v. Becker, 334 F.Supp. 546, 549 (S.D.N.Y.1971) (Weinfeld, J.), aff'd, 461 F.2d 230 (2d Cir. 1972). The supervising Judge had the most intimate knowledge of the facts and circumstances of the surveillance. Where as here it can be found that the Judge carefully and actively supervised the surveillance, his determination that minimization was achieved "is itself a substantial factor tending to uphold the validity" of that decision. *Id.*

### IV.

 In analyzing the investigation conducted herein, the parties have prepared various statistical analyses relating to the content of intercepted calls. Such analyses must be received with caution. *See* United States v. Focarile, 340 F.Supp. 1033, 1049 (D.Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972); United States v. King, 335 F.Supp. 523, 542 (S.D.Cal. 1971), rev'd, 478 F.2d 494 (9th Cir. 1973) (on other grounds). While statistical correlations may provide guidance on the question of minimization, such calculations can be misleading and, if so, should not be accepted as conclusive on that question. *Id.* Mathematical manipulations prepared for the purpose of the instant review are necessarily grounded on retrospective and self-interested analysis by lawyers or agents, who have utilized the benefits of time and hindsight. The emphasis in deciding minimization must be on the perspective of the inspectors as of the time of the surveillance. Informed second guessing of the inspectors, even bolstered by percentages, should not cloud that perspective. The inquiry should not be reduced to a game of numbers, played out in a vacuum, and sealed off from its real consequences.

From the evidence before the Court including the logs and reports made contemporaneously with the operation of the wiretap and on analysis of the computations submitted, the Court finds the following.

During the operation of the wire surveillance, which continued for 34 days on phone one and 14 days on phone two, a total of 2,604 calls were made or received on phone one, and 832 on phone two. All of these calls, 3,436, were automatically recorded. Of these 3,436 calls, 1,378 were not completed due to busy signals, wrong numbers and the like, and some 84 calls were made to information, weather and similar services. The number of completed conversations which were recorded from both phones was 2,058 (or 1,974 if the service calls are omitted) and of these only 90% were "intercepted." 18 U.S.C. § 2510(4).

Of the 2,058 completed calls, 1,557 were finished in two minutes or less; 1,277 of these—or more than half the total of all completed calls—lasted one minute or less. A call of such brief duration ordinarily does not lend itself to minimization; such a brief call is completed before the agents can confidently even determine the nature of the call and identify the parties to it.

Only 501—or approximately 25% of the completed calls—lasted three minutes or more. Of these, approximately 71 involved Donna talking with a party not a defendant herein. Some of these were intercepted, since Donna sometimes served as a message center for the conspirators and took important messages during her handling of the telephone traffic in these premises. However, most of the calls which involved Donna and a friend were not intercepted except

in the early stages of the tap before her position was identified.[12]

Approximately 79% [13] of the balance of the calls lasting three minutes or more involved at least one known co-conspirator, and other calls involved persons seemingly implicated. In the context of this investigation of a large scale narcotics conspiracy which had overtones of internal security problems, self-evidently such calls should be generally intercepted in the early stages of the surveillance. At that stage many parties are unknown to the agents and a call involving a known conspirator quite possibly is with a co-conspirator previously not identified as such. As the search progresses and the names of callers are learned, interception of calls made by the known conspirators allows the agents to effect the necessary screening of persons somehow related to these known conspirators. Through listening to calls, it can be determined whether a particular individual who had been seen by visual surveillance teams meeting with the conspirators is actually not involved with the criminal activities.[14] Realization that a call is innocent, after several calls involving the same individual are reviewed, has relevance to the investigation. Judge Travia's orders specifically made relevant, calls tending to identify the participants in the conspiracy.

If the unknown party turns out to be a co-conspirator, of course his calls are properly intercepted; calls between known co-conspirators should be monitored, for relevant information may emerge at any point in a call. A study of the logs herein reveals that the agents were making on-going identifications of callers and of the character of their involvement.

In determining how many of the calls might have been unrelated to the investigation, one should not lose sight of the great amount of highly relevant material which was contained in the majority of the calls. Early in the surveillance, for example, the agents monitored a call between Bynum and one Vernon Thomas, perceived to be a Bynum lieutenant, concerning a prospective meeting between Thomas and "Sergeant," who was apparently a New York City policeman. Due to this call, the meeting was visually surveilled.

The agents heard a series of calls during the first week of the tap, in which Bynum spoke to parties then identified as "Yolanda," "Herman," "Brooks," Cordovano, and an unknown party which apparently related to narcotics trafficking. They also learned of important ramifications through a series of unanswered calls made to a number later identified as that of a former federal narcotics agent. Additionally, calls involving attorneys of a seemingly incriminating nature were being received. Clearly related calls were continuous throughout the period of surveillance. In fact, the few calls actually introduced into evidence at the trial were intercepted during the last 10 days of the tap.

These continuous conversations helped the agents to identify the parties actually involved in Bynum's criminal activities, to clarify their understanding of those activities, and to coordinate parallel investigatory efforts being undertaken at the time.

A retrospective analysis of the calls was prepared by the government, purporting to demonstrate the relevance of the calls to the investigation. This study concludes that 85% of the completed calls contained information useful

12. A surveillance report of February 4, 1971 indicates a contemporaneous suspicion that Donna was involved in the drug processing activities.

13. This figure is derived from defendants' tables which identify participants in, and the time of, each call.

14. Even where one party to the call is not a known conspirator, the content of the call might prove relevant. For example, in call W118, Mae Garnett spoke with an unidentified female. During the conversation, use of drugs and sales of drugs were discussed.

to the investigation.[15] This figure, as a product of hindsight knowledge and review, is of course not conclusive.

The implications which defendants seek to draw from the mathematical collations proffered by them are factually unsupported and unsupportable. They are result oriented and do not portray an accurate or fair reflection of the proper perspective of the seemingly endless conversations even if considered on a retrospective basis of a wisdom born of hindsight.[16]

The Court, after its own review of the materials submitted herein, finds that the percentage of intercepted conversations that were not relevant or which fell outside the broad scope of the authorization orders was *de minimis*.

The defendants have called special attention to the conversations which they say were with attorneys, sometimes identified, sometimes not. They label these as "privileged." The facts do not so demonstrate.

In the beginning stage of the tap, the callers who were in fact attorneys had not conclusively been identified as such. Name and voice identification usually required multiple calls. On incoming calls, the attorney often did not state his name and was not called by his name and did not announce his profession. Even after names were learned, those names at first did not connote "attorneys" to the monitoring agents. Some lead time was necessary before discriminating patterns of interception could be established.

Moreover, even if the agents had been provided with a list of attorneys derived from visual surveillance of visitors to the premises, there was no assurance that such callers would converse on privileged matter.

A call from a lawyer to a person is not automatically privileged. It is basic that the privilege only inures to a client and that discussions of illegal activities to further illegal activities are not masked by testimonial privilege. Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933); United States v. Kahn, 366 F.2d 259, 265 (2d Cir.), cert. denied, 385 U.S. 948, 87 S.Ct. 321, 17 L.Ed.2d 226 (1966).

Thus, it is not a privileged communication to be told by or to discuss with a lawyer that some third party has committed or has been picked up for murder or for violation of parole, or that he needs money (ostensibly for criminal enterprise), etc. The attorney-client privilege exists where the purpose of the communication is to obtain professional legal advice, United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961), not news of others, gossip or criminality.

From the very first attorney call (although not so recognized at the time) through the duration of the tap, references in the calls made the content of these conversations highly relevant to the investigation and, even more, suggested that the lawyers were involved in facilitating illicit activities of some aspect of Bynum's enterprise. The calls were replete with references to co-conspirators, possible influence peddling and official corruption, and to other illegal acts.

More particularly, the alleged conversations with callers now portrayed by

---

15. The reports submitted to Judge Travia indicated the number of calls perceived at the time as relating to illicit activity; that number set against the total number of calls produces a somewhat lower percentage of relevant calls. However, the number of drug related or corruption related calls provide only one aspect of relevant calls. The present estimate reflects a broader concept of relevance, including calls helping to identify parties and calls allowing placement of persons at particular places during the investigation.

16. Defendants have submitted summaries of selected calls; the basis used for selecting the calls has not been provided, although the Court requested this information. The Court has read these summaries and finds nothing in them which contradicts the findings stated herein.

defendants as lawyers reveal the following:

Call W168 made on February 1, 1971, discussed the arrest of Dickie Diamond on a charge of murder and his subsequent parole; Bynum suspiciously thought "something is fishy." Further, the caller stated: "take care of Wright. Ken just told me about that. I'll speak to him." Abraham Wright was a narcotics distributor convicted herein. This call, which is obviously relevant to an investigation of security leaks, bribery, and Bynum's colleagues, contains no privileged communication.

Joey Cordovano, another principal convicted herein, was discussed on February 1 and 7 by the alleged attorneys.

On February 10, the caller reported "a friend of Donald Jones got arrested for killing a girl—not for killing her, for acting in concert in killing her," to which Bynum later says "he's talking about Donnie." On February 13 Bynum tells the caller to "go down to the Seventy-first Precinct. Vernon Thomas." Someone, possibly Thomas, was found with pistols, and Bynum significantly adds "the sergeant's in there now." Another arrest for another murder is reported by the caller on February 13, when Donald King was arrested. The caller states "we told him to go to New Jersey till we could speak to the DA," and he tells Bynum how the murder charge should have been beaten.

The caller on February 18 reports to Bynum a list of achievements obtained on behalf of Bynum. He indicates he "got Donald Jones dismissed, the murder"; "Charles Howard's stuff dismissed"; "I got a gun charge dismissed. I got a drug charge dismissed. I got a [sic] auto larceny dismissed"; "Joyce Dickerson was dismissed". The caller further stated "I spoke, I was with the cops all day. . . . Uh, O'Neil. Justice. (. . . . .) Butler, I forget the rest of the names. There [sic] not bad guys, you know, they, they helped out where they could, but you know, it's a bad case."

The import of this call was not lost on the agents, who transcribed it and who made this log entry:

Attorney to Bynum (Fingers)—discussed his day's efforts to get hijackers off—from conversation—appears hijackers worked for Bynum—also named police officers who "did what they could but they had an identification."

Money, the lubricant of the narcotics trade, provided another series of suspect calls. For example, in call W186, made February 1, Bynum tells an unidentified male that he wants $30,000. On February 4, Bynum's call indicated that Wright, a conspirator herein, would bring the lawyer $2,000. On February 9, Bynum is seeking a loan of $25,000 and on February 10 he talks of "$18,000 worth of merchandise."

A considerable number of the alleged "attorney calls" involved only messages to or from Bynum for call backs; the defendants do not mention this. Such calls are not even arguably privileged; they were however relevant at the time to the agents who were tracking Bynum's whereabouts and movements.

Most of the calls from and to lawyers ended quickly—in a minute or less—creating difficult problems in screening such calls; of the conversations compiled by defendants, only 10 of 67 lasted more than three minutes. The defendants correctly say that "a privileged communication may unavoidably be intercepted due to its brevity or due to the failure of the monitoring agents to realize that the communication was privileged."

Furthermore, in the calls of longer duration, at least spot monitoring was necessary to make certain the parties to the calls did not change. In the two longest calls included in defendants' compilation and claimed as privileged, Bynum started out talking to a lawyer, but then talked with Joey (likely Cordovano). Conversations between co-conspirators were highly relevant and prop-

erly intercepted; the defendants' index does not reflect this.

A number of the calls in defendants' listing involved attorneys calling their families or associates from Bynum's narcotics factory. Obviously, no professional privilege inuring to any of the defendants attaches to this type of call.

The Court has carefully reviewed each of the calls reproduced and indexed by defendants, and finds in these calls little that is privileged and much that is prima facie criminally suspect. Interception of these calls, against the background of this case, was an exercise of reasonable judgment and authorized.

18 U.S.C. § 2517(4), cited by defendants, provides:

> *No otherwise privileged* wire or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character. (Emphasis supplied).

This section only applies to conversations which are "otherwise privileged," and this Court has found the vast majority of calls compiled by defendant not to be privileged. Moreover, the statute cited deals with authorization for disclosure of calls. Aside from possible internal use, the government did not disclose any that were even arguably privileged; none was used on the trial.

### V.

In sum, the Court finds that the agents conducting the instant interception, as well as the officials supervising them, made a good faith effort to achieve the requisite minimization, and "on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." United States v. Tortorello, 480 F.2d 764 (2d Cir. 1973). The procedure by which the agents suspended interception of seemingly innocent calls represented in the given circumstances a substantial and sufficient effort to limit the interception of unrelated calls.

The number of days for which the interception continued was far smaller than that approved of in United States v. Tortorello, 480 F.2d 764 (2d Cir. 1973). The number of days authorized by Judge Travia in each of his three orders was less than the maximum period allowed by the Act; a limitation of days, like a limitation of monitoring hours, represents a cognizable minimization of the intrusion into privacy.

Most impressive on this record is the attentive and dedicated supervision provided by Judge Travia over the broad authorization he gave the agents. This distinguishes the instant case from the decision in United States v. King, 335 F.Supp. 523 (S.D.Cal.1971), rev'd, 478 F.2d 494 (9th Cir. 1973) (on other grounds). This Court finds that there was herein an ongoing and informed review of the interception as it was in progress, which represented a clear safeguard for the rights of the defendants.

Defense counsel have conjured up procedures which might have been followed at the time of the surveillance to achieve a greater percentage of minimization. Some of these suggestions are logical, and might well have been adopted by the agents *if* the agents, as counsel, had the benefit of later learned knowledge when the plans for the interception were drawn. The agents, however, were limited by the practical situation they faced and had to act accordingly.

As with a criminal trial, a defendant is not entitled to perfection in the censorship of what is available to be overheard on the tap; he is entitled to a fair effort from the government agents at not overhearing what is irrelevant to the search. This invokes a judgment quotient on the part of the surveillance agents and requires a determination whether they unfairly abused their authority to listen in.

The important law-enforcement tool provided by Congress and carefully tailored to meet exacting constitutional standards should not be dulled by uncompromising administration to a point

420

of practical ineffectiveness. The Court must guard, as Mr. Justice Harlan warned in United States v. Blue, against "increase to an intolerable degree interference with the public interest in having the guilty brought to book." 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L. Ed.2d 510 (1966).

I conclude that the obligation to minimize was properly ordered and complied with in this case.

The foregoing shall constitute the Court's findings and conclusions to be submitted pursuant to the remand by the Court of Appeals.

So ordered.