**UNITED STATES of America,**
**Appellee,**

v.

**Vincent RIZZO et al., Appellants.**

**Nos. 385, 879, 450, 451, 632, 505, Dockets 73–2012, 73–2088, 73–2219, 73–2457, 73–2405, 73–2584.**

United States Court of Appeals, Second Circuit.

Argued Dec. 18, 1973.

Decided Feb. 7, 1974.

Certiorari Denied June 10, 1974. See 94 S.Ct. 3069.

Henry J. Boitel, New York City, for appellant Rizzo.

David M. Markowitz, New York City, for appellant DiLorenzo.

Stanley S. Arkin, New York City (Mark S. Arisohn, New York City, of counsel), for appellant Salli.

Herbert W. Yanowitz, San Francisco, Cal. (Arkin & Horan, Herbert Monte Levy, New York City, of counsel), for appellant Mizono.

Joseph Fontana, Brooklyn, N. Y. (Edward A. Panzarella, Brooklyn, N. Y., of counsel), for appellant Heimerle.

Henry Putzell, III, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y.; Barbara Sue Jones, Sp. Atty., U. S. Dept. of Justice, S. Andrew Schaffer, Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY, FEINBERG and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This is an appeal from convictions arising from an attempt to distribute a large quantity of counterfeit United States currency. Appellants were all convicted of conspiring to possess and distribute counterfeit currency in violation of 18 U.S.C. § 371, and in addition, appellants Rizzo,[1] Salli and Heimerle were convicted of the substantive count of possessing counterfeit bills in violation of 18 U.S.C. § 472. A sixth defendant, Joseph Calise, was also found guilty of both the conspiracy and possession counts, but has apparently abandoned his appeal before this court. All of the defendants were acquitted on the third count of transferring the counterfeit bills in violation of 18 U.S.C. § 473.

The Government's evidence was as follows: In the spring of 1972 appellant Rizzo was attempting to find outlets for a large quantity of counterfeit $50 and $100 bills he expected to receive shortly. He contacted Hyman Grant in an attempt to sell him a substantial portion, telling him that the bills would have 30 separate serial numbers, and he enlisted the aid of Fred Mayo in finding other buyers. Mayo contacted appellant Heimerle, who in turn contacted two friends in California, Calise and appellant Mizono, to see if they could dispose of the bills. Appellant Salli was to be the supplier of Rizzo's phony bills, and appellant DiLorenzo acted as intermediary or perhaps as overseer of the Salli-Rizzo exchange. On May 2, 1972, the delivery of a certain amount of bills to Rizzo was completed following a call between DiLorenzo and Rizzo in which DiLorenzo gave directions as to where Rizzo should meet Salli. The bills, however, failed to have the 30 different serial numbers as originally indicated. This upset Rizzo, who complained in a phone call to Salli. Rizzo, nevertheless, gave the samples to Mayo who in turn gave them to Heimerle. Heimerle then mailed them to California, where Calise, on May 6, acknowledged receipt of the samples and said that he had passed them on to Mizono. The same day that Rizzo received the samples he sent a messenger to the house of William Benjamin in Philadelphia,[2] and on the next day Se-

---

1. Appellant Rizzo is the same person whose narcotics convictions were affirmed by a panel of this court in United States v. Rizzo, 491 F.2d 215 (1974) (hereinafter *Rizzo I*).

2. Benjamin was also involved in Rizzo's narcotics transactions. *Rizzo I*, at 215–216.

cret Service agents recovered in Philadelphia counterfeit bills later identified as identical to the samples shown Mayo the day before. On May 3 Rizzo and Mayo flew to Miami to show the samples to Grant as well as $80,000 in the counterfeit bills. Grant complained that the bills did not have the promised 30 different serial numbers, and Rizzo and Mayo returned to New York. On May 9 or 10 Grant, now in New York, told Rizzo he had seen a newspaper story about an arrest of people passing counterfeit bills in Philadelphia; Rizzo said that it had been silly to send some of the bills to Philadelphia but there was nothing he could do now. On May 10 when Mayo asked Rizzo if certain counterfeiting arrests at Kennedy Airport involved their bills, Rizzo replied in the negative, but that the whole deal was off now. This information was passed along to Heimerle and Mizono.

The Government's case consisted of the testimony of both Grant and Mayo as well as the results of certain wiretaps on six phones at four different locations and certain observations by police officers involved in a physical surveillance of appellants. Appellants raise a number of challenges on appeal to the admissibility of the taped conversations obtained from the wiretaps.

■ The first claim is that the warrants authorizing the taps were not based upon probable cause and were not sufficiently particularized as to the offenses to be investigated. Without attempting to summarize the extensive affidavits accompanying the large number of requests for warrants, extensions, and amendments, suffice it to say that this court has reviewed them and found that probable cause existed as to each appellant, upon which the warrants could be based, including conversations pertaining to assorted criminal enterprises, including extortion, burglary, illicit gambling, felonious assault, etc., etc. We further find that against this massive backdrop of evidence of variegated criminal activity, the warrants described the offenses to be investigated with the requisite particularity. Cf. United States v. Tortorello, 480 F.2d 764, 778–781 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

■ Another claim is that there was a failure to minimize the wiretap interceptions as required by 18 U.S.C. § 2518(5) and NYCPL 700.30(7), McKinney's Consol. Laws, c. 11–A. We have recently reviewed the minimization of these self-same wiretaps in Rizzo I, 491 F.2d at 215–218 and what we said there is equally applicable here. The prosecution fulfilled its burden by making a prima facie showing that minimization was achieved through the testimony of police officers who related how they ceased monitoring as soon as they could determine that the call was nonpertinent, and how they did not monitor privileged conversations. Defense counsel introduced no evidence to the contrary. In such a situation, the district court did not err in finding that minimization had been accomplished. Rizzo I, at 218.

■ A related claim is that the warrants were invalid on their face because it did not explicitly call for minimization. Such a failure, however, we have stated in United States v. Manfredi, 488 F.2d 588 (2d Cir. 1973), at 590, 597–599, is not necessarily fatal. There we said: "We feel it proper to read both the orders themselves and the minimization language of the supporting affidavits in 'a commonsense and realistic fashion.'" Id. at 598. Here each affidavit stated that interception would be "executed in such a manner as to minimize the possibility of intercepting privileged or nonpertinent conversations." Moreover, the warrants themselves contained language that nothing shall be construed as authorizing overhearing or interception of any communication "which appears privileged or unrelated to the aforementioned crimes." In light of such language, the warrant fulfills the requirements of New York law. United States v. Manfredi, at 598.

■ Appellant Rizzo advances the notion that because the eavesdrop applications for two of the tapped phones did not explicitly specify that they were pay phones, the evidence obtained through those taps should be suppressed. Such an argument apparently was not made below, nor does appellant Rizzo cite to us a single case where wiretap evidence was suppressed for such a reason. Not only did the warrant protect the general public's privacy by limiting authorization to tap conversations of only certain individuals, but in fact the pay phones were not used by the general public, being used instead exclusively by Rizzo and his associates for their personal benefit.[3] Thus there can be no claim that the public's privacy was inadequately protected by virtue of the magistrate's ignorance of the fact that the phones were pay telephones.

■ 18 U.S.C. § 2518(8)(d) requires that not later than 90 days after the termination of a tap the judge who issued the warrant must cause notice to be served on the person named in the order and, in the discretion of the judge, on any others whose conversations were overheard, that such a wiretap existed during a certain period. The New York CPL has a similar provision, § 700.-50(3). Appellant Mizono claims that he did not receive the required notice. The first two calls about which Mizono complains involved conversations to which he was a party, but the warrants pursuant to which these conversations were overheard did not name Mizono as a party to be overheard. Thus, the court had to provide notice only at its discretion. There is no showing of abuse of discretion by not providing it within a certain time period. Four other conversations complained of were between Calise and appellant Heimerle in which mention was made of Mizono. Inasmuch as Mizono was neither named in the relevant warrant nor a party to the conversations he had no right to notice of the taps un-

der either New York or federal law. One call on May 10, 1972, falls within the mandatory requirements of notice under state and federal law, and yet no notice was given until December 18, 1972, a month later than it should have been, but still five months before the suppression hearing. We believe, as indicated in United States v. Manfredi, at 601, that the touchstone to the determination whether to suppress wiretap evidence on a claim of failure of notice should be prejudice to the defendant. *See also* People v. DiLorenzo, 69 Misc.2d 480, 330 N.Y.S.2d 720, 728 (Cty.Ct. 1971). Here no claim of actual prejudice has been made, nor do we see how it could be, and, thus, we find that the district court did not err in admitting evidence of that one telephone call.

■ Appellants further claim that interceptions of conversations dealing with counterfeiting, a crime not specified in the warrants, were not properly validated pursuant to 18 U.S.C. § 2517(5) and CPL § 700.65(4) as being made within the authorization of the warrants. This claim is belied by this court's holding in United States v. Tortorello, 480 F.2d 764, 781–783 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973), squarely allowing the procedure used here. Indeed, the facts here are for all intents and purposes identical to those in *Tortorello*.

■ Appellants Salli and DiLorenzo charge that there was insufficient independent evidence to establish their participation in the conspiracy so as to allow the use of hearsay evidence against them. Moreover, appellant Salli claims that in any case there was insufficient evidence to support his conviction of conspiracy, and that this failure of proof vitiates his conviction on the substantive count as well. As to Salli we have no difficulty in finding sufficient evidence both to support a finding that he was a participant in the conspiracy and to support a finding of guilt.

---

3. On one such phone, in Jimmy's Lounge, an "out of order sign" was posted over the coin slots of the pay phone used, so that the public would not use it.

The independent evidence consisted of wiretapped conversations between Salli, Rizzo and DiLorenzo, the results of a physical surveillance, and the testimony of both Grant and Mayo as to the counterfeit money. While the wiretapped conversations are guarded enough so as not to specify that the callers were engaged in counterfeiting, the deliberately vague means of communicating and the unmistakable reference to fear of an informer working for Rizzo identify the object of the conversations as one not likely to be within the law. Only the evidence that this joint undertaking dealt with *counterfeiting* needed to be supplied. This indeed was done when Salli met with Rizzo and immediately thereafter Rizzo had possession for the first time of the counterfeit bills. While such evidence is circumstantial, that does not detract from its probative value. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). This evidence, therefore, met the test of demonstrating Salli's participation in the conspiracy "by a fair preponderance of the evidence independent of the hearsay utterances." United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Thereafter, the testimony by Grant referring to the promised 30 different serial numbers which were not actually supplied further involves Salli through Salli's conversation with Rizzo admitting that the 30 "styles of sweaters" originally promised were not delivered.

The same independent evidence which established Salli's participation in the conspiracy establishes DiLorenzo's participation. Interspersed among his cryptic intercepted conversations was the clear denial to Salli that there were any informants working with Rizzo; and DiLorenzo gave Rizzo the very directions to meet Salli as a result of which Rizzo first obtained possession of the counterfeit bills. This chain of independent evidence easily satisfies the "fair preponderance" requirement. The fact that Rizzo at one point told Grant not to talk to DiLorenzo about the counterfeit bills is some evidence of the latter's nonparticipation, but is equally susceptible to the interpretation that DiLorenzo, as Rizzo's boss, did not want to be directly linked with the transaction.

Appellants also challenge the admission into evidence of certain counterfeit bills seized in Philadelphia on the ground that there is no evidence that they are bills from this conspiracy. There was, however, ample evidence establishing that the bills offered in evidence had the same serial number as the counterfeit money offered Mayo and Grant by Rizzo. Moreover, Rizzo's acknowledgment of sending counterfeit bills to his friend, Benjamin, in Philadelphia and their seizure corroborates that the bills offered in evidence were indeed from this conspiracy.

Appellant DiLorenzo also complains that his voice was insufficiently identified in the wiretap conversations. Three detectives of the New York City Police Department identified the tape-recorded voice as DiLorenzo's. We might tend to agree that the minimal exposure these detectives had to appellant's voice makes their identification doubtful, but this doubt merely goes to the weight to be given to the detectives' testimony, not to the admissibility of the recordings. The jury was properly instructed as to the burden on the Government to connect the recordings to the defendants, and the jury could judge the testimony of the witnesses better than we can. The standard for the admissibility of an opinion as to the identity of a speaker is merely that the identifier has heard the voice of the alleged speaker at any time. United States v. Bonanno, 487 F.2d 654 (2d Cir. 1973) at 655, 659.

Appellants raise other claims which do not merit discussion.

Judgments of conviction affirmed.