# SPEASE AND ROSS v. STATE OF MARYLAND

[No. 120, September Term, 1974.]

*Decided May 29, 1975.*

*Motion for rehearing filed June 27, 1975; denied July 3, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Fred Warren Bennett* for appellants.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court. ELDRIDGE, J., dissents and filed a dissenting opinion at page 110 *infra.*

Charged in the Circuit Court for Prince George's County with conspiracy to distribute cocaine, Clifton Spease and Willie Ross filed an oral motion prior to trial to suppress incriminating evidence obtained through a court-authorized telephone wiretap; they contended that the State had violated the terms of the court's wiretap order and the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Chapter 119, 18 U.S.C. §§ 2510-2520, by not minimizing the interception of communications as required by § 2518(5) and in failing to serve the requisite inventories required by § 2518(8)(d). The trial court denied the oral motion to suppress after an evidentiary hearing. At a jury trial which subsequently ensued, the incriminating evidence obtained through the wiretap was admitted and Spease and Ross were convicted. On appeal, the Court of Special Appeals found no merit in the contention that the trial court erred in denying the motion to suppress. *Spease and Ross v. State,* 21 Md. App. 269, 319 A. 2d 560 (1974). We granted certiorari to determine whether the Court of Special Appeals was correct in so concluding.

Section 2518(5) requires that every order or extension of an order authorizing the interception of wire or oral communications

> "shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ."

Section 2518(8)(d) directs that within a certain specified time, the judge issuing or denying authorization to intercept

> "shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of —
>
>> (1) the fact of the entry of the order or the application;
>>
>> (2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and
>>
>> (3) the fact that during the period wire or oral communications were or were not intercepted."

Section 2518(10)(a) provides:

> "Any aggrieved person [as defined in § 2510] . . . may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that —
>
>> (i) the communication was unlawfully intercepted;
>>
>> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
>>
>> (iii) the interception was not made in conformity with the order of authorization or approval.
>
> . . . If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. . . ."

The wiretap order in this case was issued in conformity with Title III and Maryland Code (1971 Repl. Vol.) Art. 35, § 94.[1] *See State v. Siegel,* 266 Md. 256, 292 A. 2d 86 (1972). That probable cause was shown by the State for issuance of the order was not contested. The material facts underlying issuance of the order are not in dispute and were succinctly outlined in the opinion of the Court of Special Appeals (Moylan, J.), as follows:

"The wiretap order now under review was issued by Judge Ernest A. Loveless, Jr., on December 8, 1971. The probable cause therefor was contained in the affidavit of Detective Snow. The probable cause began accumulating on April 8, 1971, and continued to accumulate over the ensuing eight months. It was learned that Ross, who lived at 7404 Walker Mill Road in the District Heights area of Prince George's County, was a major dealer for the heroin which permeated the Fairmont Heights section of that county. He was the wholesale supplier for Daniel Deal, Shandy Richardson, Jr., Artemus Logan and James Arnett. Throughout the spring of 1971, Ross's *modus operandi* was for his retailers to come to his apartment at 7404 Walker Mill Road to purchase their uncut heroin in wholesale quantities. They would then and there 'cut' or dilute the drugs for eventual resale. A discreet surveillance put both the appellant Ross and Daniel Deal together at that address on May 3, 1971.

"Ross's 1967 Cadillac was also observed parked on occasion at the intersection of 61st Street and Eastern Avenue in Fairmont Heights, an intersection frequently used by drug users as a distribution point. The community there is known as 'Junky Hill'.

"Information coming in from the Narcotics Squad of the Washington Metropolitan Police revealed that Ross had sold $900 worth of heroin to a government undercover agent on May 15, 1971, from an address at 7282 79th Avenue in Landover, Prince George's County. A second sale of $500 worth of heroin was made to the same undercover agent on

---

1. Now Code (1974) Courts and Judicial Proceedings Article, §§ 10-401 to 10-408.

June 5, 1971. This second sale was made from a 1969 Buick, with District of Columbia personalized tags TJS, which Buick had been observed three days earlier, on June 2, 1971, parked in front of Ross's apartment. The heroin obtained on both May 15 and June 5 was chemically analyzed to be 9.1% pure, a quality of definitely wholesale strength. Street heroin almost universally tested out to be of a strength of 2% or less. On July 13, 1971, the undercover agent who had made the purchases of May 15 and June 5 was shot.

"Detective Snow arrested Ross on July 13, 1971, on two charges of distribution of heroin to the undercover agent. Detective Snow confirmed Ross's address as of that time as 7404 Walker Mill Road.

"On November 17, 1971, Detective Snow learned reliably that Ross was still dealing heavily in both heroin and cocaine. As a result of the July 13 arrest, however, Ross had radically changed his *modus operandi.* He was apprehensive of police interference and no longer kept the drugs at his home. A prospective purchaser would have to telephone Ross at home. Ross would then direct the purchaser to go to a specified location. Ross would then call a third person to meet him and the purchaser at that location. The third person would bring the drugs from its rotating 'stash'. The designated meeting places would generally be a motel or a location in Palmer Park, Maryland. Discreet surveillance had picked up the appellant Ross, the appellant Spease, one Gloria Holmes and an unknown fourth person at the Howard Johnson's Motel in Cheverly on October 3. Gloria Holmes was a known addict. Police records revealed that narcotics complaints had been lodged against Spease. A records check with the Howard Johnson's Motel revealed that Ross had been a frequent guest there.

"It was established that Ross, post-July 13, would sell drugs only to retail dealers and only in wholesale quantities. He would have no contact with ultimate users. The drugs sold would be of an unadulterated, higher quality and the sales usually involved sums of money in excess of $500. Ross would deal only with persons known to him. Automobile

surveillance turned out to be unavailing. Ross regularly used evasive driving techniques — driving around the block several times watching in his rear-view mirror, making unexpected U-turns in the middle of little-traveled streets. To discourage even neighborhood surveillance, Ross had installed a closed circuit television camera mounted on a house across the street, focused on his own apartment with a monitor inside the apartment. After the *modus operandi* changed on July 13, even Detective Snow's highly credible confidential source was cut off from direct contact with Ross. The entire operation had gone telephonic." 21 Md. App. at 272-74, 319 A. 2d at 562-63.

Finding from Detective Snow's affidavit that there was probable cause to believe that "Willie Ross and other unknown persons are conspiring to violate and are violating the law with respect to controlled dangerous substances," and that Ross's home telephone was being used in connection with the conspiracy, the court authorized placement of the wiretap, and interception of communications, "during all hours of the day and night" from 4:00 p.m. on December 10, 1971, until December 24, 1971, at 8:30 p.m. The court's order specified that the telephone communications to be intercepted would be between Ross and his suppliers, and Ross and his buyers, and would relate to the delivery to Ross by his suppliers, and the delivery by Ross to his buyers of illegal narcotic drugs. The order directed that the wiretap authorization would not automatically terminate "when the type of communications described above have first been obtained, but should continue until communications are intercepted which reveal the details of the scheme which has been used by Willie Ross and others as yet unknown to receive, counsel, buy and sell illegal narcotic drugs, and the entirety of his confederates, and places of operation and the manner of the conspiracy involved therein or for a period of fifteen days from the date of this Order, whichever is earlier." In compliance with 18 U.S.C. § 2518(5), the court's order provided that the wiretap "be conducted in such a way as to minimize the interception of communication not otherwise subject to interception." In

accordance with the requirements of 18 U.S.C. § 2518(8)(d), the court's order directed

> "that within a reasonable time, but not later than ninety (90) days after the termination of the Order entered herein there shall be served, on the persons named in the Order, and such other parties to intercepted communications as the court may determine in its discretion that is in the interest of justice, an inventory which shall include notice of:
>
> (a) the fact of the entry of the Order
>
> (b) the date of the entry and the period of authorized approved interception
>
> (c) the fact that during the period wire or oral communications were or were not intercepted."

The order also directed that the State's Attorney provide reports to the court every fifth day during the period of the authorized wiretap showing "what progress has been made towards achieving the authorized objective and the need for continued interception."

## I

At the hearing on the oral motion to suppress the incriminating evidence obtained through the court-authorized wiretap, Spease and Ross (hereinafter referred to as petitioners) called Detective Snow as their witness for the purpose of showing that the provisions of the court's order and of Title III requiring the minimization of interceptions had not been satisfied. Evidence was adduced showing that connected to the monitoring device were a tape recorder and a voice activator which would activate the recorder whenever Ross's telephone receiver was picked up. Snow testified that all calls were monitored in their entirety, but that "once a call was determined it was a personal call, and clearly personal, then the tape recording was cut off." Snow indicated that he had a record of all such personal calls where the tape recorder had been cut off and could

"count them up" but the petitioners did not ask that he do so. Snow testified that no conversations between Ross and any attorney, clergyman, psychiatrist, or medical doctor were intercepted. Snow said that he paid no attention to conversations between Ross's children and other children, and cut off the recorder in instances involving personal calls made by Ross. Snow testified that during the course of monitoring Ross's home phone the parties talked through use of a code and that, as a result, he and his assistants listened to all calls. He explained:

> "Because when a drug code is used or replacement words are used for an actual narcotic, it only takes one word or two words to throw into a conversation where we would know that it was a drug conversation or drug related."

In affirming the trial court's denial of petitioners' motion to suppress for failure to minimize interceptions, the Court of Special Appeals noted that the evidence produced at the suppression hearing was "skimpy" as to the usual use made of Ross's home telephone; that no evidence was adduced to establish what adults, if any, other than Ross, resided in his home and what use they might typically make of the phone; that no evidence was adduced to show the number of children residing in Ross's home or their normal use of the phone; and that no evidence was adduced bearing on Ross's telephone habits in general or his specific use of the telephone during the period of the interception for non-criminal purposes.[2]

The Court of Special Appeals concluded that the State had not failed to minimize the interception of communications in violation of the court's order and § 2518(5). It said:

> "We believe that the turning off of the tape recorder on clearly non-criminal conversations and

---

2. In its opinion, the Court of Special Appeals set forth the total number of telephone interceptions made during the authorized period, together with the number believed to be related to the drug conspiracy. No evidence to this effect, however, was introduced at the suppression hearing or at the trial of the case.

the essential 'tuning out' on the children's conversations represent a bona fide attempt at as much minimization as the investigative problem would allow. There was no evidence that conversations between adults other than Ross were ever intercepted. We are persuaded that the degree of vigilance here employed, in dealing with a cautious and chary operative involved in a subtle and widespread conspiracy, was not unreasonable."

In support of its holding, the Court of Special Appeals relied upon a number of cases including *United States v. LaGorga,* 336 F. Supp. 190 (W.D. Pa. 1971); *United States v. Bynum,* 360 F. Supp. 400 (S.D. N.Y. 1973); and *United States v. Cox,* 462 F. 2d 1293 (8th Cir. 1972). It noted what the court said in *LaGorga,* at 196:

"[I]t is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated. It is certainly not unusual for two individuals using the telephone to discuss social matters or items of general interest before getting to the precise point which is to be covered in the call. Similarly, when a call is made to a residence, the telephone is often answered by a young child who will turn it over to one of the adult members of the household at some point in the conversation. It is also rather common that a telephone conversation initially between two children will later develop into a discussion between adults."

\* \* \*

"It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take. It is also true that, during the early part of the surveillance, it was necessary

for the agents to familiarize themselves with the voices of those who were working with the defendants."

In *Bynum*, the court observed, at 410:

"Even the fact that 100% of the calls made or received during the limited period of surveillance were intercepted, if this were established, though significant, should not be overestimated. The determination of whether minimization was achieved in a particular case requires close scrutiny of, *inter alia*, the type of criminal enterprise being investigated; the scope of that enterprise and the number of participants, known and unknown, involved therein; the number of days for which electronic surveillance is conducted; [and] the scope of the authorizing order."

In *Cox*, the court said, at 1300-1301:

"Accordingly, where, as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value."

The petitioners contend that the police completely disregarded the mandate to minimize interception of communications because they monitored all telephone calls made over Ross's home phone in their entirety between December 10 and December 24. They claim that efforts to minimize must be reasonable; that turning the tape recorder off on personal calls did not amount to minimization of interceptions as the "interception" of communications regulated by Title III refers to listening to, monitoring or hearing such communications, either at the time they occur or at a subsequent time through the use of a playback recorder; that even if some personal calls were not recorded,

and even if there was a "tuning out" on the children's conversations, there was nevertheless an "interception" of every telephone call in its entirety during the life of the wiretap order; and that the value of the evidence obtained (one incriminating phone conversation) was minimal in relation to the number of calls intercepted.

The standard for compliance with the requirement to minimize is the overall reasonableness of the totality of the conduct of the monitoring agents in light of the purpose of the wiretap and the information available to the agents at the time of interception. *See United States v. Scott*, 504 F. 2d 194, 198 (D.C. Cir. 1974), *rev'g* 331 F. Supp. 233 (D.D.C. 1970). The congressional reports accompanying the wiretap statute and decisions interpreting § 2518(5) make it plain that the minimization standard, like the standards traditionally applied to the determination of probable cause, is one of reasonableness which must be ascertained from the facts and circumstances of each particular case. *United States v. James*, 494 F. 2d 1007, 1018 (D.C. Cir. 1974). Otherwise stated, the provisions and history of Title III, read together, indicate that the minimization requirement of § 2518(5) is nothing more than a congressional command to limit surveillance as much as possible in the circumstances, *i.e.*, the minimization question must be considered on a case-by-case basis. *United States v. Cox, supra*, 462 F. 2d at 1300. *See also* Senate Report No. 1097, 90th Cong., 2d Sess., U. S. Code Cong. & Admin. News, 2116, 2190 (1968). It has been held that the minimization requirement is satisfied if on the whole the monitoring agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion. *United States v. Tortorello*, 480 F. 2d 764 (2nd Cir. 1973). The reasonableness of the conduct of the monitoring agents at the time of the interception and their good faith are determining considerations. *United States v. James, supra; United States v. Manfredi*, 488 F. 2d 588 (2nd Cir. 1973). Thus, interception of virtually all conversations may violate the minimization requirement in a particular factual setting, *see United States v. King*, 335 F. Supp. 523 (S.D.

Cal. 1971), *rev'd on other grounds*, 478 F. 2d 494 (9th Cir. 1973), but may be justified in other circumstances, as in *United States v. Bynum*, 485 F. 2d 490 (2nd Cir. 1973), *vacated on other grounds and remanded*, 417 U. S. 903, 94 S. Ct. 2598, 41 L. Ed. 2d 209 (1974); *United States v. Manfredi, supra;* and *United States v. Cox, supra*, where it has been held, in effect, that the mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirements of the statute. Of course, that many intercepted calls were innocent in retrospect does not imply failure to minimize, anymore than failure to succeed at minimization constitutes failure to minimize. *United States v. Scott, supra.*

A synthesis of the numerous court decisions dealing with the minimization requirement suggests that there are a number of factors which aid courts in determining the reasonableness of an interception. These include: (1) the nature and scope of the crime being investigated; (2) the sophistication of those under suspicion and their efforts to avoid surveillance through such devices as coded conversations; (3) the location and the operation of the subject telephone; (4) government expectation of the contents of the call; (5) the extent of judicial supervision; (6) the duration of the wiretap; (7) the purpose of the wiretap; (8) the length of the calls monitored; (9) the existence of a pattern of pertinent calls, which the monitoring agents could discern so as to eliminate the interception of non-pertinent calls; (10) the absence of monitoring of privileged conversations.

The record made by the petitioners on the minimization question at the suppression hearing was, as they admit, "woefully weak or silent" on the following points: (a) scope of enterprise and number of participants; (b) activity on the phones being monitored; (c) number of calls; (d) number of calls monitored; (e) length of calls; (f) participants in calls; (g) experience of agents deployed for investigation; and (h) the supervision of the interception by the investigating agency, supervising attorney and authorizing court. While the inclusion of such pertinent information in the record

undoubtedly would have permitted a more informed determination of the merits of the minimization issue, that fact alone does not provide sufficient reason to remand the case for a further evidentiary hearing, as petitioners suggest. We thus shall consider the issue on the evidentiary record made by the petitioners on their motion to suppress.

Sparse though it is, we think the record demonstrates that Detective Snow and his assistants, in the particular circumstances of this case, made a reasonable and good faith effort to minimize the interception of non-pertinent communications which they were not authorized to intercept. Turning off the tape recorder on personal calls was plainly part of that effort. Section 2510(4) defines "intercept" as "the aural acquisition of the contents of any wire or oral communication . . . ." Because "aural" means both "of or relating to the ear" and "of or relating to the sense of hearing," *Webster's Third New International Dictionary* 144 (unabridged 1961), we think that "aural acquisition" refers to the acquisition of a message by means of a tape recorder as well as by means of the human ear. *See* Note, *Minimization of Wire Interception: Presearch Guidelines and Postsearch Remedies*, 26 Stan. L. Rev. 1411, 1415-17 (1974). To conclude, as petitioners urge, that "intercept" refers only to hearing or listening to communications, and not to recording, would suggest that one who records a conversation through a wiretap by means of a voice activated tape recorder, but who does not listen to, or hear the conversation at that time (or later during a playback) could possibly escape the criminal or civil liabilities imposed by Title III, a result which Congress could not have intended. Moreover, if listening to a conversation were an interference with rights of privacy, the preservation of that conversation for whatever purpose by means of a tape recording would be a greater interference with privacy interests manifestly productive of more serious harm. Consequently, that Snow and his assistants refrained from recording conversations as soon as they ascertained the personal nature of the calls is in itself a good faith effort to minimize interception.

While normally a home telephone is more associated with privacy expectations than a pay phone or a phone used exclusively for criminal activities, *see United States v. James, supra,* 494 F. 2d at 1020-21, Ross's home and his home phone were central instruments in furtherance of his narcotics distribution operations. This circumstance would plainly justify a more extensive monitoring than a case where the phone was only an incidental part of a criminal conspiracy. Moreover, the monitoring agents had probable cause to believe that they were dealing with a sophisticated individual who knew that he was under police surveillance and who was bent on avoiding detection of his conspiratorial activities, *e.g.,* evasive driving techniques and the use of a closed circuit television system to counter police surveillance. In view of this background, and because the police were investigating an organized criminal conspiracy utilizing a code in conversing over the telephone in furtherance of the conspiracy, it was not unreasonable for the monitoring agents to listen to all conversations, particularly since, as Snow testified,

> "when a drug code is used or replacement words are used for an actual narcotic, it only takes one word or two words to throw into a conversation where we would know that it was a drug conversation or drug related."

Obviously, the monitoring agents could not determine the content of a communication unless they listened to it, and the fact that Ross was suspected of being involved in a narcotics conspiracy, with its own jargon or code, necessitated listening to more seemingly innocuous conversations, with more attention, than otherwise would have been required if a simple type of crime were being investigated. That calls involving Ross's children were monitored, albeit in cursory fashion, does not mandate a finding that there was failure to minimize; indeed, as the Court of Special Appeals noted, the cases take cognizance of the initial use of children to mask subsequently incriminating conversations. Where, as here, it appears

plain that Ross knew his activities were under police surveillance, the monitoring agents would have been derelict had they not monitored the children's calls until satisfied that they were of a personal nature.

That the wiretap was only of two weeks' duration, and the court required periodic reports of police progress, are other factors bearing on the reasonableness of the conduct of the monitoring agents. All circumstances considered, as disclosed by the meager record before us, we conclude that the Court of Special Appeals correctly applied the law to the facts of this case in holding that the police made a reasonable and good faith effort to minimize the interception of unauthorized communications. Having so concluded, we find it unnecessary to determine whether failure adequately to minimize requires suppression of all the conversations overheard.

## II

At the suppression hearing, Ross testified that he did not receive the inventory required by the court's order and by § 2518(8)(d), notifying him that his phone had been tapped and his telephonic communications intercepted. The State thereafter produced the testimony of Detective Snow; it showed that on January 5, 1972, a search warrant had been issued authorizing a search of Ross's home for illegal drugs. The warrant incorporated an affidavit of Detective Snow which contained all of the information required by both the court's order and § 2518(8)(d) to be set forth in the inventory; additionally, the affidavit set forth the content of an incriminating phone conversation between Ross and Spease which formed the core of the State's case against the petitioners. The warrant and affidavit were received in evidence at the suppression hearing. Snow testified that he personally served the warrant and affidavit upon Ross and that he orally informed Ross of the wiretap order on January 5, 1972, during execution of the search warrant, and told him at that time "that all the details concerning this interception were inside the affidavit." Snow conceded that

Spease was never given a copy of the search warrant application and no inventory was ever served upon him.

The Court of Special Appeals held that the State did not comply with the requirement of § 2518(8)(d) that Ross, as a person named in the intercept order, be served an inventory notifying him of the wiretap within 90 days of its termination. But it held that there was substantial compliance with the statute by reason of Ross's having received a ·copy of the search warrant and affidavit containing all of the required information within twelve days after the tap had been terminated. Because Spease was not named in the wiretap order, the Court of Special Appeals held that under § 2518(8)(d) it was within the discretion of the judge who issued the order to determine whether the interest of justice required that he be given an inventory. After noting that Ross and Spease were represented by the same attorney, it concluded "that Spease suffered no prejudice through lack of formal notification and that Judge Loveless did not abuse his discretion in not requiring an inventory to be served on Spease."

The petitioners contend that the inventory requirement of § 2518(8)(d) cannot be satisfied by providing the requisite information as part of an affidavit in support of a search warrant. They point out that at the time of their indictment on February 22, 1972, twenty-eight days remained of the 90-day period afforded the State to serve the inventory. They claim that strict compliance with the provisions of Title III has been mandated by the Supreme Court of the United States in *United States v. Giordano*, 416 U. S. 505, 94 S. Ct. 1820, 40 L. Ed. 2d 341 (1974), and by this Court in *State v. Siegel*, 266 Md. 256, 292 A. 2d 86 (1972), and that substantial compliance with § 2518(8)(d) will not suffice. They contend that actual knowledge of the wiretap, or lack of prejudice, is never a determinative factor in considering whether failure to serve the requisite inventories compels suppression of the intercepted communications. Spease contends that his incriminating conversation with Ross must be suppressed because the judge who issued the wiretap order did not exercise the discretion vested in him

under § 2518(8)(d) to determine whether it was in the interest of justice that Spease be supplied with a copy of the inventory.

The purpose of the inventory requirement contained in the statute is well expressed in *United States v. Eastman,* 326 F. Supp. 1038, 1039 (M.D. Pa. 1971), *aff'd* 465 F. 2d 1057 (3d Cir. 1972):

> "The provision for service on the defendant of an inventory and notice within ninety days of the wiretap is not meaningless. It eliminates, insofar as practicable, the possibility of completely secret electronic eavesdropping and grants to the person involved an opportunity to seek redress for an abusive interception either by a civil action for damages or by a suppression of the evidence in a criminal case."

Where prejudice is not shown, or actual knowledge of the wiretap is evident, it has been held that failure to serve the inventory in strict compliance with the requirements of the statute does not require suppression. *See United States v. Rizzo,* 492 F. 2d 443 (2nd Cir. 1974); *United States v. Wolk,* 466 F. 2d 1143 (8th Cir. 1972); *United States v. Smith,* 463 F. 2d 710 (10th Cir. 1972); *United States v. Lawson,* 334 F. Supp. 612 (E.D. Pa. 1971); *United States v. LaGorga, supra. Cf. United States v. Bernstein,* 509 F. 2d 996 (4th Cir. 1975). *United States v. Eastman,* 465 F. 2d 1057 (3rd Cir. 1972), involved a wiretap authorization which, on its face, deliberately waived notice to the subject of the wiretap. The court said:

> "The touchstone of our decision on this aspect of the case at bar is not one in which an inventory was delayed but rather is one in which specific provisions of Title III were deliberately and advertently not followed. In other words the failure to file the notice or inventory . . . resulted from a judicial act which on its face deliberately flouted and denigrated the provisions of Title III

designated for the protection of the public. This we cannot countenance. The communications were unlawfully intercepted. Therefore, the provisions of § 2518(10)(a)(i) apply and the motion to suppress must be granted." *Id.* at 1062.

In *Eastman,* the court noted with approval the distinction made in *United States v. LaGorga, supra,* between complete and deliberate failure to file thĕ inventory, and the absence of prejudice from the late filing of an inventory. *See also People v. Hueston,* 34 N.Y.2d 116, 312 N.E.2d 462, 356 N.Y.S.2d 272 (1974), where the Court of Appeals of New York, faced with the same wiretap order that was involved in *Eastman,* rejected the reasoning of that case and held that the failure to file an inventory was excused because the defendant had actual notice of the wiretap.

That Ross received actual notice of all the information required to be provided by § 2518(8)(d), within the time period specified in the court's order, is plain. That the requisite information was transmitted to him by means of a search warrant application, and not by a document entitled "inventory," is not in our opinion dispositive of the question whether there was compliance with the statute. The obvious intent of § 2518(8)(d) is to provide for notification of the wiretap by means of a document reasonably calculated to transmit the required information within the specified time. We think that in the circumstances of this case the notification provided to Ross constituted compliance with the inventory requirement of the statute.

In so concluding, we are mindful of the fact that in *United States v. Giordano, supra,* the Supreme Court held that

"Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." 416 U. S. at 527, 94 S. Ct. at 1832, 40 L. Ed. 2d at 360.

In that case, it was held that the authorization of the application for an intercept order by the Executive Assistant to the Attorney General, who, unlike those specified in § 2516, was not subject to senatorial confirmation, represented a failure to meet a precondition to the authorization of the wiretap which "was intended to play a central role in the statutory scheme." *Id.* at 528, 94 S. Ct. at 1832, 40 L. Ed. 2d at 360. Consequently, the Court held that the wiretap was void *ab initio*, and under § 2518(10)(a)(i) all of the wiretap evidence must be suppressed.

In *United States v. Chavez*, 416 U. S. 562, 94 S. Ct. 1849, 40 L. Ed. 2d 380 (1974), the Supreme Court said that it did not go so far in *Giordano* "to suggest that every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful' . . . [since] . . . [t]o establish such a rule would be at odds with the statute itself." *Id.* at 574-75, 94 S. Ct. at 1856, 40 L. Ed. 2d at 392. In *Chavez*, it was held that the misidentification of the person authorizing a wiretap application approved by the Attorney General was not a " 'failure to satisfy any of those statutory requirements which directly and substantially implement' " the congressional intent. *Id.* It is thus clear that, while Congress intended that some of the statutory requirements of Title III be strictly construed, it did not intend that the courts interpret the statute in such a way as to subvert its effectiveness. *See United States v. Kahn,* 415 U. S. 143, 94 S. Ct. 977, 39 L. Ed. 2d 225 (1974). In *United States v. Bernstein, supra,* the court, citing *Kahn, Giordano,* and *Chavez,* said that a violation of Title III is material only if Congress intended the statutory provision that was not followed to be a precondition to obtaining intercept authority, and that whether it was or not depended on its role in the statute's system of restraints on electronic surveillance.

In *State v. Siegel, supra,* we said:

"The statute [Title III] sets up a strict procedure. that *must* be followed and we will not abide any

> deviation, no matter how slight, from the prescribed path. . . . Since the surveillance here failed to meet certain preconditions designed to protect appellee's constitutional rights, the evidence that arose from it must be suppressed . . . ." 266 Md. at 274, 292 A. 2d at 95-96.

The fatal defect in *Siegel* was the failure of the order authorizing the wiretap to meet the precondition requirements of §§ 2518(4)(e) and 2518(5) in that, unlike the order in the present case, it did not specify that the surveillance was to be conducted over a certain time period; that there was to be automatic termination upon the interception of certain conversations; that the surveillance was to commence as soon as practicable; that the interception of non-pertinent conversations was to be minimized; and that the tap should terminate upon the attainment of the objective of the surveillance.[3]

As heretofore indicated, suppression of the intercepted communications would not be warranted simply because Ross received the requisite notification of the wiretap through receipt of a search warrant application. No particular form of the inventory notification is prescribed or required by § 2518(8)(d); all that is essential is that the form used convey the information required by the statute. The form, therefore, does not play a central role in the statutory scheme and is not a precondition to obtaining intercept authority under *Giordano* and *Siegel*.

While the judge who issued the wiretap order could have directed that Spease, as a party to an intercepted communication, be served with a copy of the inventory required by § 2518(8)(d), the fact that he failed to exercise his discretion in this regard does not require suppression of Spease's intercepted communications under the facts of this case. The record discloses that petitioners were jointly indicted on February 22, 1972, within sixty days after the termination of the wiretap. On March 9, 1972, an attorney

---

3. Nothing in our opinion in this case is intended to depart in any way from our holding in *Siegel*.

entered his appearance on behalf of both Spease and Ross. It is hardly unreasonable to infer that counsel was then in possession of the information contained in the search warrant application served on Ross, and knew of the wiretap order and of the intercepted communications. On May 17, 1972, the petitioners filed a motion for discovery and inspection of wiretap materials, consisting of the application, the affidavit, the wiretap order, and the recorded conversations. The State's Attorney agreed to disclose this information informally. In any event, the record discloses that three weeks prior to trial Spease received the information requested.

Spease was not the target of the wiretap order, and his rights are primarily protected by § 2518(9) which prohibits use of evidence of intercepted communications against a party unless at least ten days prior to trial he has been furnished with a copy of the application and wiretap order. Of course, a person who should have been named in the wiretap order, but was not, falls within the provision for mandatory service of the inventory. *United States v. Bernstein, supra.* Unlike the facts in *Bernstein,* however, Spease was not a "known person" who had to be named in the wiretap order. Since Spease received the required subsection (9) notice, and since he had actual notice of the wiretap at least as early as May 17, 1972, almost six months prior to trial, Spease did not suffer any prejudice. *See United States v. Rizzo, supra; United States v. Iannelli,* 477 F. 2d 999 (3d Cir. 1973), *aff'd on other grounds,* 420 U. S. 770, 95 S. Ct. 1284, 43 L.Ed.2d 616 (1975); *United States v. Ripka,* 349 F. Supp. 539 (E.D. Pa. 1972), *aff'd* 480 F. 2d 919, 491 F. 2d 752 (3d Cir. 1973). The lack of service of an inventory upon Spease was not an intentional act of evasion by the State which impinged upon his constitutional rights or placed him at any tactical disadvantage; nor did it have such a result. *See United States v. Chun,* 503 F. 2d 533 (9th Cir. 1974). Consequently, Spease was not entitled to suppression of the intercepted conversations.

*Judgments affirmed; petitioners to pay costs.*

*Eldridge, J., dissenting:*

In my view, the requirement of 18 U.S.C. 2518(5) and of the court's order, that the wiretap be conducted so as to minimize the interception of unauthorized communications, was clearly violated in this case. I disagree with Part I of the majority opinion, which decides otherwise, on essentially three grounds.

*First,* in holding that "[t]urning off the tape recorder on personal calls was plainly part of" a reasonable "effort to minimize," the majority relies upon an unlawful action by the police. The same statute, in 18 U.S.C. 2518(8)(a), requires that the "contents of any wire or oral communication intercepted by any means authorized by this Chapter shall, if possible, be recorded on tape or wire or other comparable device." Since there is no suggestion in this case that it was not "possible" to record all communications, the police violated the statute by turning off the tape recorder. Congress, in enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2510-2520, could not have intended that a failure to record would constitute compliance with the statutory minimization requirement when at the same time Congress directed that all communications be recorded.

*Second,* the majority opinion places the burden upon the petitioners to have made an adequate record on the minimization issue. However, it is settled that the prosecution has the burden of proof on this matter. *United States v. Rizzo,* 491 F. 2d 215, 217-218 (2d Cir.), *cert. denied.* 416 U. S. 990, 94 S. Ct. 2399, 40 L.Ed.2d 769 (1974); *United States v. Manfredi,* 488 F. 2d 588, 600 (2d Cir. 1973), *cert. denied,* 417 U. S. 936, 94 S. Ct. 2651, 41 L.Ed.2d 240 (1974). Moreover, even if the petitioners had the initial burden on the question, the presentation of evidence disclosing that *all* calls on a home telephone were listened to in their entirety, including all personal calls to or from members of the household not involved in the alleged criminal activity, would constitute a prima facie showing of a failure to meet the statutory minimization requirement, thereby shifting

the burden to the State to present evidence justifying its action.

*Third,* in light of the record in this case, and the principles set forth in decided cases involving the minimization requirement of 18 U.S.C. 2518(5), there was simply no compliance with the statutory mandate by the police here. The cases cited in the majority opinion do not support the result reached in this case.

(1)

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2510-2520, was enacted in response to the decisions of the Supreme Court in *Berger v. New York,* 388 U. S. 41, 87 S. Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States,* 389 U. S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967), where the Court reversed, on Fourth Amendment grounds, criminal convictions based in part upon evidence obtained by eavesdropping. *See State v. Siegel,* 266 Md. 256, 266, 292 A. 2d 86 (1972); Senate Report No. 1097, 90th Cong., 2d Sess., U.S. Code Cong. & Adm. News, 2112, 2113, 2153. *Berger* involved eavesdropping authorized by an overbroad New York statute, and *Katz* involved eavesdropping without judicial authorization. In striking down the New York statute, the Court in *Berger* stated that the statute failed to contain safeguards "to prevent unauthorized invasions of the 'sanctity of a man's home' " and "invasions of privacy." 388 U. S. at 58. In listing certain specific defects in the statute, the Supreme Court pointed to the authorization to eavesdrop without requiring the police officer "to describe with particularity the conversations sought" and giving the "officer a roving commission to 'seize' any and all conversations." (*Id.* at 59.) Consequently, the first purpose of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 was said to be "protecting the privacy of wire and oral communications . . . ." Senate Report, *supra,* at 2153.

One of the specific measures adopted by Congress in Title III to protect the privacy of communications, and· to overcome the problem found in *Berger* of giving the police

"officer a roving commission" to intercept communications, was the provision in 18 U.S.C. 2518(5) that every order "shall contain a provision" that the wiretapping or eavesdropping "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this Chapter . . . ." *See United States v. Tortorello*, 480 F. 2d 764, 783 (2d Cir.), *cert. denied*, 414 U. S. 866, 94 S. Ct. 63, 38 L.Ed.2d 86 (1973) (the minimization requirement was adopted "in order to prevent unnecessary intrusion into the privacy of the surveillance target"); *United States v. Bynum*, 360 F. Supp. 400, 411 (S.D.N.Y.), *on remand from* 475 F. 2d 832 (2d Cir.), *aff'd*, 485 F. 2d 490 (2d Cir. 1973), *vacated on other grounds*, 417 U. S. 903, 94 S. Ct. 2598, 41 L.Ed.2d 209 (1974) ("minimization is . . . one element of the composite group of statutory safeguards included in the Act.").

In the instant case, the communications subject to interception under Title III, and those specified in the order of the circuit court, were "wire communications . . . between Willie Ross and his supplier" and "wire communications . . . between Willie Ross and his buyers" concerning the delivery and price of illegal narcotic drugs. Nevertheless, Prince George's County Police Detective Elmer L. Snow, the only witness at the suppression hearing on the minimization issue, testified that he or one of the other police officers "listened to each and every conversation that emanated from the phone number in its entirety." While stating that he did not "really pay attention to what the children were saying" in calls from "a child to a child," he admitted that even those calls were listened to by him in their entirety.[1] Snow acknowledged that there were "several" personal calls on the telephone in question, although he was unable to say how many, and that all of these calls were listened to completely.

---

1. The majority opinion points out that Snow testified that "no conversations between Ross and his attorney, clergyman, psychiatrist, or medical doctor were intercepted." However, the reason why no such calls were intercepted was because there were in fact no calls between Ross and these persons. There was one call between someone else in Ross's home and a "law clerk" in the office of the caller's lawyer, and this call, like all others, was listened to in its entirety.

Snow's testimony disclosed that the *only* effort by him or the other police officers designed to minimize the interception of calls was that "once a call was determined that it was a personal call, and clearly personal, then the tape recording was cut off."

Since the police did nothing else which might arguably constitute an effort to minimize the interception of non-pertinent calls, the majority opinion relies upon the turning off of the tape recorder as amounting to a reasonable and good faith effort to minimize. However, in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, in the very same section as the minimization requirement, Congress provided (18 U.S.C. 2518(8)(a)):

> "The contents of any wire or oral communication intercepted by any means authorized by this Chapter *shall,* if possible, *be recorded* on tape or wire or other comparable device." (Emphasis supplied.)

There is, of course, no suggestion in this case that it was not "possible" to record all of the conversations. Therefore, each failure by the police to record a conversation or part of a conversation was a violation of the statute.

An illegal act under a statute cannot rationally be the basis for holding that another requirement of the same statute, *viz.* minimization, was met. Moreover, it is inconceivable that Congress could have intended that the turning off of the tape recorder be an act towards minimization within the meaning of subsection (5) of 18 U.S.C. 2518, when at the same time it mandated in subsection (8)(a) of 18 U.S.C. 2518 that the contents of all communications be recorded.

In addition, the language of subsection (8)(a) refutes the majority's view that the words "intercept" and "interception" in the statute mean "the acquisition of a message by means of a tape recorder as well as by means of the human ear." Subsection (8)(a) provides that the contents of a "communication *intercepted* by any means authorized

by this Chapter shall . . . be *recorded* on tape." (Emphasis supplied.) Obviously the words "intercepted" and "recorded" are used to designate different actions. The statute makes it clear that the recording of the communication is a separate procedure, occurring subsequent to the interception of the communication. *See United States v. Bynum, supra,* 360 F. Supp. at 408-409.

The failure to record conversations which are intercepted, instead of satisfying the minimization requirement of the statute, may frustrate the effort of a court to determine whether those unrecorded conversations should have been listened to in their entirety. In *United States v. Manfredi, supra,* 488 F. 2d at 599, the Court of Appeals pointed out that "[t]he court has examined . . . the transcription sheets with some care in order to appreciate more fully the claims made by both the defendants and the Government with respect to minimization." *See also United States v. Bynum, supra,* 475 F. 2d at 837, where the Court of Appeals stated that the "reels of tape" containing the recording of the conversations had to be analyzed in order to determine whether there had been minimization. And on remand, in *United States v. Bynum, supra,* 360 F.Supp. at 406, the district court pointed to the recording of "all interceptions" as being part of the government's minimization plan.

As pointed out by the United States Court of Appeals for the Second Circuit in the first *Bynum* opinion, *supra,* 475 F. 2d at 837, and by the district court on remand in the same case, 360 F.Supp. at 409, the " 'evil' to be limited by this [minimization] requirement is the listening to innocent calls." Whether or not there is a record of the calls does not lessen the invasion of privacy if all calls were listened to in their entirety. What is accomplished by the failure to record is to deprive the reviewing court of the opportunity to examine the intercepted calls in order to determine whether the interceptions were consistent with the minimization requirement.

The statutory mandate that all intercepted calls be recorded is a salutary one. But in any event, the violation of the recording requirement cannot be relied upon as

constituting compliance with the minimization requirement of the same statute.

(2)

Another error in the majority opinion in this case relates to the burden of proof on the minimization issue. The majority state that "[t]he record made by petitioners on the minimization question at the suppression hearing was . . . 'woefully weak or silent' on the" various factors pertinent to the matter of minimization. While describing the record as "sparse," the majority nevertheless decide that they "shall consider the issue on the evidentiary record made by the petitioners on their motion to suppress." The majority thus assume that the petitioners had the burden of making an "evidentiary record" to establish that the police had failed to minimize interceptions.

However, the cases hold that the prosecution has the burden of proof on the minimization issue. In *United States v. Rizzo, supra,* 491 F. 2d at 217, the Court of Appeals stated:

> "The burden of proof on the minimization issue under either federal or state law necessarily rests, in the first instance, on the Government. . . . The United States Attorney must be prepared to sustain that burden even in a case where the defense is unprepared or chooses not to present its own evidence on the issue. The Government might, of course, in a proper case, move for a postponement or adjournment when, after meeting its initial burden, it becomes necessary to present more extensive analysis of eavesdropping materials to rebut analysis and argument by defense counsel."

*See also United States v. Manfredi, supra,* 488 F. 2d at 600.

It is only logical for the prosecution to have the burden of proving compliance with the minimization requirement. The duty to comply with the statutory mandate is the State's. The statute places no duty upon the accused. Moreover, the factors pertinent to minimization are matters within the

peculiar knowledge of the State and not the accused. It is the prosecution which is supposed to know of the number of calls during the period of the wiretap, the number of calls related to alleged criminal activity, the number of personal calls, the nature of the calls, the parties involved, etc. And it is the prosecution which is supposed to have a recording of the calls so that the number and character of the calls can be scrutinized to determine if an effort was made to minimize.

In the present case, the State introduced absolutely no evidence at the suppression hearing on the minimization question. The only evidence was the testimony of Detective Snow who was called as a witness by the petitioners.[2]

Finally, even assuming arguendo that the petitioners had the burden of initially coming forward with evidence on the minimization issue, they met the burden in this case. Petitioners presented evidence showing that the tapped telephone was a residential telephone with persons other than Willie Ross living in the household,[3] that the police listened to all calls on the telephone in their entirety, that included among the calls listened to were "several" personal calls, that the police officer in charge of the wiretap operation did not know how many calls or how many personal calls were made during the wiretap period, and that the police failed to record the monitored personal conversations thereby preventing a court from scrutinizing them. This presentation of evidence by the petitioners certainly amounted to a prima facie showing of a failure by the police to comply with 18 U.S.C. 2518(5). If petitioners had the burden of proof on minimization (which they did

---

2. It is noteworthy that when petitioners' counsel attempted to ascertain from Detective Snow certain information relevant to minimization, such as the number of calls and the number of personal calls when the tape recorder was turned off, Detective Snow was unable to give the information.

3. The testimony at the suppression hearing disclosed generally that there were children living in the home who used the telephone. Later in the case, the record reveals specifically that petitioner Willie Ross's wife, Gloria Ross, and their three minor children were residents of the house. There has never been even any suggestion in the case that Gloria Ross or any of the children were engaged in criminal activity.

not), enough was shown to shift the burden to the State to present evidence justifying the police action.

### (3)

Considering the record in the present case, there was simply no effort here to minimize the interception of non-pertinent communications. The majority's conclusion to the contrary goes far beyond any of the cases on the minimization question, including those cited in the majority opinion.

In several of the cases cited by the majority, the police did not listen to all calls in their entirety during the wiretap period; moreover, there were other factors present, which are not present here, which were deemed to justify the conclusion that a reasonable effort toward minimization was made. In *United States v. Cox*, 462 F. 2d 1293, 1301 (8th Cir. 1972), while the court stated that the electronic eavesdropping was "extensive" and that "[a]pparently there were irrelevant conversations recorded," there is no indication that *all* calls in their entirety were monitored. Also in *Cox*, all of the monitored calls were recorded, and there was judicial supervision of the interceptions with reports to the judge every five days during the wiretapping. In *United States v. Tortorello, supra,* 480 F. 2d at 783-785, the court pointed out that "[a]s soon as it was determined that any conversation overheard was not pertinent, all interception immediately ceased." The number of non-pertinent calls intercepted in *Tortorello* was deemed to be "*de minimis.*"

The court in *United States v. LaGorga,* 336 F. Supp. 190, 196 (W.D. Pa. 1971), pointed out that it "reviewed the transcript of all of the calls, a lengthy and tedious task, and finds that . . . the monitoring of many conversations was terminated . . . ." In *United States v. Bynum, supra,* 360 F. Supp. at 408-417, all of the intercepted calls were recorded; many non-pertinent calls were not intercepted; as to several calls the monitoring agent "dropped his headphone" and stopped listening when it was determined that a call was

innocent; and the court found "that the percentage of intercepted conversations that were not relevant or which fell outside of the broad scope of the authorization orders was *de minimis." See also United States v. Rizzo, supra,* 491 F. 2d at 217 ("both monitoring and recording were stopped when it had been determined that a call was not pertinent"); *United States v. Focarile,* 340 F. Supp. 1033, 1049 (D. Md.), *aff'd on different issue sub nom United States v. Giordano,* 469 F. 2d 522 (4th Cir. 1972), *aff'd,* 416 U. S. 505, 94 S. Ct. 1820, 40 L.Ed.2d 341 (1974) (only 355 out of 630 calls containing conversations were monitored).

It is true that a few federal court cases have upheld particular wiretaps as being in compliance with the minimization requirement even though all calls were monitored in their entirety. *See United States v. James,* 494 F. 2d 1007, 1018-1023 (D.C. Cir. 1974); *United States v. Manfredi, supra.* Regardless of the validity of these holdings in light of the congressional mandate that "every" wiretap shall be conducted in such a way as to minimize the interception of innocent conversations, they do not support the majority decision in the present case. In *James,* the telephone was used exclusively to conduct illegal business, and the place where it was "located served no residential function." (494 F. 2d at 1020, 1022-1023.) The conversations were recorded, and regular reports were submitted to the authorizing judge during the period of the wiretap (*id.* at 1022). Finally, in *James,* at least seventy percent of the calls related to the narcotics conspiracy, and only twelve percent could "be determined to involve neither narcotics nor other criminality." (*Ibid.*) In *Manfredi,* all of the calls were recorded, and the court examined the transcriptions in order to evaluate the government's claim that it did as much as it could to minimize. (488 F. 2d at 599.)

It is readily apparent that in the cases holding that there was government compliance with the minimization requirement, the prosecution presented substantial evidence upon which the courts could base their holdings. The State presented no such evidence here. The record in this case contains less evidence on minimization than was present in

the first *Bynum* case, *supra*, 475 F. 2d at 837, where the United States Court of Appeals for the Second Circuit refused to find minimization and remanded the matter for further proceedings, saying (emphasis supplied):

> "Unlike the district court cases which have considered the minimization problem in other Circuits, *we have here no breakdown or analysis of the intercepted conversations.* We do know that 198 reels of tape containing more than 3000 conversations were made available to appellants before trial. *What percentage of these are irrelevant or innocuous we do not know.* The record only indicates that on one phone between January 30, 1971 until February 13, 1971, some 770 completed telephone calls were intercepted. Of these, 108 allegedly relate to illegal drug traffic and 21 refer to other criminal activity. This information is provided in the affidavit of an Inspector of the Bureau of Narcotics and Dangerous Drugs in support of the extension of the initial wiretap order of Judge Travia.
>
> "A reading of the testimony of the agent who supervised the surveillance would indicate that all conversations were recorded but only those presumably inculpatory were ever transcribed. The mischief lies in the interception obviously and what was not transcribed remains unknown. Although there is an allegation that the conversations were coded and guarded, which may account for the total interception, *we are provided with no explanation of why some minimization was not possible to achieve. We know nothing of the nature or tenor of those calls which might be deemed innocent.*"

In the subject case, we know even less about the intercepted calls.

In *State v. Siegel, supra*, 266 Md. at 273-274, this Court stated with respect to Title III, and in particular with

respect to the requirement that wiretap orders contain a direction to minimize interceptions, the following:

> "The State urges that no more than substantial compliance with the federal act is essential. In its brief it takes the rather cavalier attitude that: 'The rote recitation that the interception shall be executed as soon as practicable and in such a way as to minimize the interception of communications not otherwise subjected to interception has no real meaning so long as the authorizing court' scrutinizes the manner in which the surveillance was actually conducted. We cannot accept this rationalization. The statute sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path."

In my view, the portion of the majority opinion relating to the minimization of interceptions represents a clear departure from what the Court so recently and forcefully stated in *Siegel*.